FREEDMAN + TAITELMAN, LLP
Bryan J. Freedman, Esq. (SBN: 151990)
bfreedman@ftllp.com
Jesse A. Kaplan, Esq. (SBN: 255059)
jkaplan@ftllp.com
1801 Century Park West, 5th Floor
Los Angeles, CA 90067
Telephone: (310) 201-0005
Facsimile:  (310) 201-0045

Attorneys for Non-Party Bryan Freedman

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEN DOGRA, an individual<br><br>Plaintiff/Counter-Respondent<br><br>vs.<br><br>RUSTY HARDIN; RUSTY HARDIN AND ASSOCIATES, LLP; and DOES 1 through 20, inclusive,<br><br>Defendants/Counterclaimants. | Case No.: 2:22-mc-00193<br><br>USDC, E.D. Missouri<br>Case No. Case No.: 4:21-CV-00949<br><br>**DISCOVERY MATTER: JOINT STIPULATION REGARDING NON-PARTY BRYAN FREEDMAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA**<br><br>[Motion for Protective Order and Quash the Subpoena; Declarations of Ben Dogra; Bryan J. Freedman; Jesse A. Kaplan; Victoria Emery; Application for Leave to File Under Seal; and [Proposed] Order] filed concurrently]<br><br>Date:   TBD<br>Time:   TBD<br>Courtroom: TBD |

# **TABLE OF CONTENTS**

JOINT STIPULATION REGARDING NON-PARTY BRYAN FREEDMAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA ......................................................................................................1

I. NON-PARTY FREEDMAN'S INTRODUCTORY STATEMENT......................1

DEFENDANTS' INTRODUCTORY STATEMENT ............................................2

II. THE FREEDMAN SUBPOENA AT ISSUE .......................................................4

NON-PARTY FREEDMAN'S POSITION: ...............................................................4

I. FACTUAL BACKGROUND.................................................................................4

    A.    The Underlying Arbitration. ....................................................................4

    B.    The Malpractice Lawsuit. .......................................................................5

        1.The Malpractice Claim..........................................................................5

        2. Fee Dispute ........................................................................................8

    C.    Freedman's Limited Role in the Arbitration..........................................9

    D.    The Freedman Subpoena........................................................................11

    E.    The Other Depositions. ..........................................................................12

II.FREEDMAN IS ENTITLED TO A PROTECTIVE ORDER AND/OR TO QUASH THE FREEDMAN SUBPOENA...........................................................12

    A.    This Discovery Dispute Should be Resolved in the Central District of California. ..........................................................................................12

    B.    The Deposition of Freedman - Opposing Counsel - is Improper Under *Shelton* or *Friedman*...............................................................13

        1. The information sought from Freedman is not crucial and is at most, tangentially relevant. ...........................................................................14

        2. There are other means to obtain the requested information............15

    C.    Freedman is Entitled to a Protective Order under Rule 26 Even if *Shelton* and *Friedman* do Not Apply................................................16

i

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY BRYAN FREEDMAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

DEFENDANTS' POSITION: ..........................................................................................17

I. BACKGROUND .......................................................................................................17

    A. The Arbitration..................................................................................................17

    B. The Lawsuit .....................................................................................................18

    C.   The Parties' Discovery Disputes........................................................................19

II. ARGUMENT AND AUTHORITIES ....................................................................20

    A.   This Court Should Transfer the Motion to the Eastern District of Missouri (the Issuing Court) to Avoid Inconsistent Outcomes on Overlapping Discovery Issues. ......................................................... 20

    B.   In the Alternative, the Court Should Deny the Motion Because RHA Seeks Information Related to a Previously Concluded Case. ..................................................................................................................23

III. CONCLUSION.......................................................................................................27

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY BRYAN FREEDMAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

## JOINT STIPULATION REGARDING NON-PARTY BRYAN FREEDMAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

Pursuant to Local Rule 37-2, non-party Bryan Freedman and and Defendants Rusty Hardin and Rusty Hardin and Associates, LLP (the "Hardin Defendants") submit this joint stipulation (the "Joint Stipulation") relating to Freedman's motion for a protective order and to quash a certain Subpoena to Freedman. Following a conference of counsel conducted on September 20, 2022, the parties were unable to reach agreement with respect to the discovery dispute at issue.

### I.

### NON-PARTY FREEDMAN'S INTRODUCTORY STATEMENT

Non-party Bryan Freedman seeks a protective order and/or to quash a subpoena that purports to require Freedman to testify at a deposition in an action currently pending in the Eastern District of Missouri entitled *Ben Dogra v. Rusty Hardin, et al.*, Case No.: 4:21-CV-00949 (the "Malpractice Action"). Freedman, who is attorney of record and lead trial counsel for plaintiff Ben Dogra in the Malpractice Action, should not be deposed in the Malpractice Action.

The Malpractice Action centers around a malpractice claim based on discrete conduct by Rusty Hardin and Rusty Hardin and Associates, LLP (the "Hardin Defendants") in a certain arbitration proceeding. In an obvious attempt to harass and drive a wedge between Dogra and his counsel, Freedman, the Hardin Defendants have subpoenaed Freedman. And seek his deposition The Hardin Defendants cannot satisfy their burden of rebutting the presumption that it is improper to depose opposing counsel. First, the information sought from Freedman is not crucial to the defense of the Malpractice lawsuit, and at most, has tangential relevance. In pretextual and superficial fashion, the Hardin Defendants attempt to justify the Freedman deposition based on the mere fact that Freedman also represented Dogra in connection with the underlying arbitration that lasted over six years. The Hardin Defendants, however,

1

DISCOVERY MATTER: JOINT STIPULATION REGARDING NON-PARTY BRYAN FREEDMAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

ignore that Freedman's representation was both extremely limited and was completely unrelated to the specific acts or transactions that occurred in 2016 that form the basis for liability.

Second, even if Freedman was in possession of information that was both relevant and "crucial" to the Malpractice Litigation (which he does not), the Hardin Defendants can get any information related to the Arbitration from a variety of other witnesses. Notably, the Hardin Defendants have or will depose Dogra and Dogra's entire legal teal from the underlying arbitration. Freedman does not have any unique information that the Hardin Defendants cannot learn from others who were involved in the arbitration.

Accordingly, the Freedman subpoena should be quashed and Freedman should not be deposed.

## DEFENDANTS' INTRODUCTORY STATEMENT

Rusty Hardin and Rusty Hardin & Associates, LLP seek the deposition of Bryan Freedman—one of the numerous attorneys representing plaintiff Ben Dogra during the course of the arbitration proceeding underlying Plaintiff's malpractice allegations against RHA. Plaintiff does not (and cannot) dispute that his attorneys in the current malpractice lawsuit were among those who represented him in the arbitration proceeding. Such unusual circumstances of Plaintiff's own making do not preclude RHA's ability to obtain discovery from a fact witnesses with personal knowledge about the case.

Plaintiff has asserted malpractice and breach of contract claims against RHA, which are currently pending in the Eastern District of Missouri. Plaintiff brought the lawsuit alleging RHA committed malpractice during the course of RHA's representation of Plaintiff in an arbitration proceeding between Plaintiff and CAA Sports, LLC (the "Arbitration"). Numerous other attorneys (at least 9) and law firms (at least 4) also represented Plaintiff during the course of the Arbitration. Despite the involvement of other attorneys and law firms, Plaintiff has only filed suit against RHA

2

DISCOVERY MATTER: JOINT STIPULATION REGARDING NON-PARTY BRYAN FREEDMAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

and alleges that RHA is solely responsible for any damages Plaintiff allegedly suffered.

To defend against Plaintiff's claims, RHA has sought discovery from Plaintiff and a number of the lawyers involved in the Arbitration concerning their involvement. RHA's discovery efforts have been met with resistance and, to date, the Eastern District of Missouri has resolved one discovery dispute concerning Plaintiff's privilege assertions and will soon resolve another—which will be fully briefed and ripe for resolution on October 14, 2022—concerning Plaintiff's withholding of an adequate privilege log.

In its first discovery order, the Eastern District of Missouri Court ordered Plaintiff to produce documents from Mr. Freedman and his law firm that Plaintiff attempted to withhold on the basis of privilege, overruling those privilege assertions in the process. The claims of privilege addressed and overruled by the Eastern District of Missouri in its first discovery order are the same or similar to those raised by Freedman in this motion. So, deciding the issue of Mr. Freedman's deposition in this Court creates the real threat of inconsistent rulings between this Court and the Eastern District of Missouri on both discovery and privilege issues related to the lawsuit pending there, not to mention wasting the resources of this Court in the process.

Because the Eastern District of Missouri has already ruled on related issues concerning the discoverability of communications and information relating to the involvement of Plaintiff's attorneys in the Arbitration, the motion should be transferred to the Eastern District of Missouri, as permitted under Rule 45(f). Mr. Freedman is no stranger to that District. He has applied for admission pro hac vice there and is representing Plaintiff before that Court (as is his co-counsel here, Jesse Kaplan).

Nevertheless, in the alternative, Plaintiff's motion should be denied and Bryan Freedman should be ordered to comply with RHA's subpoena because RHA seeks discovery regarding a previously concluded case that is the subject of this one.

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY BRYAN FREEDMAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

## II.

## THE FREEDMAN SUBPOENA AT ISSUE

**NON-PARTY FREEDMAN'S POSITION:**

**I.      FACTUAL BACKGROUND**

### A.      The Underlying Arbitration.

The present lawsuit is based on a multi-year arbitration proceeding that plaintiff Ben Dogra ("Dogra") commenced against his former employer, CAA Sports LLC ("CAA").   In February 2015, the Hardin Defendants initiated an arbitration proceeding on Dogra's behalf against CAA by filing a Demand for Arbitration with the American Arbitration Association ("AAA") in St. Louis, Missouri entitled *Ben Dogra v. CAA Sports, LLC*, AAA Case No. 01-15-0002-7781 (the "Arbitration"). (Kaplan Decl., Ex. 1 [Petition, ¶ 10]).  Initially, Dogra was represented by the Hardin Defendants in the Arbitration.  (Dogra Decl., ¶ 3).

In summary, the Arbitration concerned CAA's wrongful termination of Dogra, a former CAA employee and head of CAA's football division, and CAA's breach of a certain written employment agreement between Dogra and CAA (the "Employment Agreement").  (Kaplan Decl., Ex. 2 [Demand for Arbitration]).  In the Arbitration, Dogra sought to recover damages from CAA based on, among other things, CAA's breach of the Employment Agreement and failure to pay Dogra various revenues related to its representation of football players and coaches.  (*Id*.).

A multi-day evidentiary hearing occurred in the Arbitration on various dates in February through April 2016.  (Kaplan Decl., Ex. 1 [Petition, ¶ 12]).  In July 2016, the arbitrator issued an initial Opinion and Award finding, among other things, that CAA had breached the Employment Agreement.  (Kaplan Decl., Ex. 1 [Petition, ¶¶ 15-17]).  Despite that award, many items, including the scope and calculation of damages remained unresolved.  Indeed, the Arbitration did not conclude until mid-2021, and included six supplemental opinions and awards.  (Dogra Decl., ¶ 2).

The Hardin Defendants were lead trial counsel and attorney of record in the

4

Arbitration through October 2018.  (Dogra Decl., ¶ 3).  Non-party Robert Lattinville, who is not a litigator, was also attorney of record in the Arbitration through its entirety.  (*Id*.).  Dogra also had an internal group of non-practicing attorneys who assisted the Hardin Defendants and Dogra  in the Arbitration, including non-parties Kyle Evans and Mark Heligman.  (*Id*.).  As will be discussed in more detail, Freedman + Taitelman, LLP ("F+T") and Bryan Freedman had a much more limited role in the Arbitration.

### B.    The Malpractice Lawsuit.

In July 2021, Dogra commenced a lawsuit against the Hardin Defendants in Missouri State Court based on the Hardin Defendants' malpractice and retention of a "flat fee" that Dogra had paid.  (Kaplan Decl., Ex. 1).  The Hardin Defendants removed the lawsuit to the United States District Court for the Eastern District of Missouri where the lawsuit is currently pending.  (Kaplan Decl., ¶ 2).  Non-party Bryan Freedman is attorney of record and lead trial counsel in the Malpractice Lawsuit.  (Freedman Decl., ¶ 3).  Freedman, who is a California resident and attorney, was admitted Pro Hac Vice to practice in the Malpractice Action.  (*Id*., ¶¶ 2-3).

### 1.    The Malpractice Claim.

In Dogra's Petition in the Malpractice Lawsuit, Dogra asserts a claim for malpractice against the Hardin Defendants based on discrete negligence that occurred in 2016 in connection with a post-hearing brief that was submitted to the Arbitrator by the Hardin Defendants.  While the Arbitration was multifaceted and involved multiple claims and issues, almost all of the issues in the Arbitration are irrelevant to the Malpractice Lawsuit.  Rather, the facts and issue that forms the basis for Dogra's malpractice claim are fairly narrow and discrete – a stipulation to certain measure of damages in a post-hearing brief (the "Post-Hearing Brief") that was submitted to the Arbitrator in **June 2016**.

In June 2016, after the evidentiary hearing in the Arbitration, Defendants submitted a Post-Hearing Brief to the Arbitrator.  (Kaplan Decl., Ex. 1 [Petition, ¶

5

13]). Among other things, the Post-Hearing Brief stated that CAA's expert concluded that the coaching employment revenue at issue[1] purportedly totaled $2,756,503. (*Id*.). Remarkably, the Post-Hearing Brief prepared by the Hardin Defendants stipulated and agreed to CAA's proffered $2,756,503 figure for the amount of CAA's coaching employment revenue that Dogra was entitled to under the Employment Agreement. (*Id*.). Moreover, the Hardin Defendants failed to request an accounting or audit of CAA's coaching revenue, or to at least reserve Dogra's rights to do so. (*Id*.). Specifically, the Post-Hearing Brief stated in relevant part as follows:

> CAA then prepared a rebuttal report, which was critical of Dr. Rishe's data and findings. Using CAA data, the rebuttal report calculated the coaching revenue represented by Section L(i) collected from November 14, 2014 to November 13, 2017 to amount to **$2,756,503**. At the hearing, CAA's rebuttal expert stood by his analysis and this amount. [Footnote] **Although this amount is subject to criticism, Claimant has accepted this figure for the purposes of this requested award**.

(Kaplan Decl., Ex. 1 [Petition, ¶ 13])(Emphasis Added).

The Post-Hearing Brief also stated in relevant part as follows:

> Understated Coaching Revenue. **The requested award accepts the coaching client revenue calculations made by CAA's damages consultant** Paul K. Meyer, even though Mr. Meyer's analysis is subject to criticism.

(Kaplan Decl., Ex. 1 [Petition, ¶ 14])(Emphasis added).

On July 18, 2016, the Arbitrator issued an Opinion and Award. (Kaplan Decl., Ex. 1 [Petition, ¶ 15]). In the Opinion and Award, the Arbitrator found, among other things, that based on CAA's breach of contract, Dogra was entitled to certain CAA coaching client revenues, and awarded a sum certain amount of $2,756,503 in damages based on CAA's failure to pay Dogra CAA's coaching client revenues.

---

[1] CAA represented both players and coaches and would commission a percentage of their earnings. Among other things, CAA commissioned a percentage of their football coach clients' employment income from the university or NFL team that employed each coach.

DISCOVERY MATTER: JOINT STIPULATION REGARDING NON-PARTY BRYAN FREEDMAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

(*Id.*).[2]  Of particular importance, the Arbitrator found that **Dogra agreed with the amount proffered by CAA in his Post-Hearing Brief**.  (Kaplan Decl., Ex. 1 [Petition, ¶¶ 15-16])(Emphasis added).

The Arbitrator also found that CAA had breached the Employment Agreement by failing to pay Dogra other categories of CAA's revenues such as marketing revenue, consulting revenue and player contract revenue.  (Kaplan Decl., Ex. 1 [Petition, ¶17]).  For all categories of claims in which the amount of damages were "in dispute", the Arbitrator ordered the parties to undertake an "audit" to calculate those damages.  (*Id.*).

In August and September 2016, the Hardin Defendants sought clarification from the Arbitrator as to certain issues raised in the Opinion and Award, including clarification as to Dogra's ability to recover additional coaching revenue through an audit.  (Kaplan Decl., Ex. 1 [Petition, ¶ 18]).  In doing so, the Hardin Defendants attempted to retract their prior stipulation to the $2,756,503 figure, and stated that Dogra was actually entitled to coaching revenue that exceeded that amount.  (*Id.*).

In September 2016, the Arbitrator issued a First Supplemental Opinion and Award.  (Kaplan Decl., Ex. 1 [Petition, ¶ 19]).  In the First Supplemental Opinion and Award, the Arbitrator summarized the particular dispute at issue as "whether there is any opportunity for Claimant [Dogra] to increase this Award amount, since the Award was stated as a sum certain." (*Id.*).  The Arbitrator ruled that since Dogra had "**specifically agreed**" in his Post-Hearing Brief to the $2,756,503 figure advanced by CAA relative to coaching employment revenues, Dogra was bound to that agreement, and could not potentially increase that figure through an audit of CAA's records. (*Id.*)(Emphasis added). Specifically, the Arbitrator ruled as follows:

> CAA argues that Dogra gets only $2,756,503 in coaching revenue.  This figure is a sum certain and cannot be increased nor subject to audit. [¶]

---

[2] The Arbitrator also awarded Dogra other measures of damages that are not at issue in the Malpractice Lawsuit.

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY BRYAN FREEDMAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

Dogra argues that he is not limited to receiving only $2,756,503.  He claims that the figure is subject to audit which audit may reveal that he may be entitled to more coaching revenue.  [¶]  **Given that Dogra specifically agreed to this figure in his Post-hearing brief, the Award reflects this agreement.  It is too late for the Claimant to take back his agreement with this figure**. As a result, the awarded sum certain for coaching revenue remains as stated in the Award.

(Kaplan Decl., Ex. 1 [Petition, ¶ 19])(Emphasis added).

In 2018 and 2019, Dogra and CAA undertook an audit of CAA's accounting records to determine the extent of CAA's client revenues.  Unfortunately, the audit confirmed that the $2,756,503 stipulated amount that purportedly reflected CAA's coaching employment revenue was grossly understated.  (Kaplan Decl., Ex. 1 [Petition, ¶¶ 20-21]).  Dogra alleges that the Hardin Defendants were negligent in stipulating and agreeing to the amount of coaching damages proffered by CAA and its purported expert, and not preserving Dogra's right to an audit or accounting. (Kaplan Decl., Ex. 1 [Petition, ¶ 22]).

## 2. The Fee Dispute.

Dogra also seeks to recover at least a portion of a "flat fee" he paid to the Hardin Defendants to represent him in the Arbitration.  In or around the fall of 2015, the Hardin Defendants agreed to charge Dogra a purported $1.575 million "flat fee" (the "Fee") for their representation in the Arbitration.  (Petition, ¶ 26).  Specifically, in exchange for the $1.575 million Fee, the Hardin Defendants agreed to serve as "lead counsel through the resolution in arbitration or a trial court in your affirmative arbitration claims against [CAA] in [the Arbitration] seeking, among other things, enforcement of your employment agreement with CAA" (the "Fee Agreement"). (*Id*.).

Though Dogra paid the Hardin Defendants the entire Fee well before the contemplated engagement was completed, the Fee was not non-refundable and was not earned upon receipt. (Kaplan Decl., Ex. 1 [Petition, ¶ 27]).  Stated differently, the Hardin Defendants were required to refund at least a portion of the Fee if they did not serve as lead counsel through the resolution of the Arbitration, and in turn, did not

perform services sufficient to merit the retention of the entire Fee.  (*Id*.).

In **October 2018**, the Hardin Defendants ceased representing Dogra in any capacity in the Arbitration or any related proceeding.  (Dogra Decl., ¶ 4).  Again, the Arbitration continued through May 2021, and Dogra was required to have attorneys other than the Hardin Defendants represent him in the Arbitration and several related proceedings through conclusion.  Because the Hardin Defendants did not serve as lead counsel through the resolution of the Arbitration, they were required to refund some portion of the Fee that they had already collected but was not fully earned.  (Kaplan Decl., Ex. 1 [Petition, ¶ 33]).

### C.      Freedman's Limited Role in the Arbitration.

Freedman and F+T had limited involvement in the Arbitration, especially from its inception in February 2015 through the summer of 2020.  (Freedman Decl., ¶¶ 5-7; Kaplan Decl., Ex. 8).  To alleviate any doubt, Dogra has produced copies of F+T's billing records from the Arbitration which detail with specificity the services rendered by Freedman and other F+T professionals in connection with the Arbitration.  (Kaplan Decl., Ex. 8).

Prior to August 2020, Freedman and F+T were never attorneys of record in the Arbitration.  (Freedman Decl., ¶ 5).  Initially, F+T provided some consultation to Dogra and the Hardin Defendants on limited issues unrelated to the facts at issue in the Malpractice Lawsuit between July and December 2015 when the Arbitration was in its infancy.  (*Id*.).  For a period of approximately four (4) years between January 2016 and April 2020, Freedman and F+T had virtually no involvement in the Arbitration. (Freedman Decl., ¶ 5; Kaplan Decl., Ex. 8).  Between January and March 2016, F+T provided extremely limited services to Dogra.  (Freedman Decl., ¶ 6; Kaplan Decl., Ex. 8).  Notably,  Freedman had a mere five billing entries during that timeframe.  (Kaplan Decl., Ex. 8).  The majority of that work in early 2016 involved the interplay between an NFL Players Association ("NFLPA")[3] union certification

---

[3] The NFLPA certifies sports agents like Dogra to represent NFL players/union

9

proceeding and Dogra's ongoing dispute with CAA. (*Id.*).

Critically, for a period of approximately four years **between late March 2016 and early 2020**, **Freedman and F+T rendered no services to Dogra**. (Freedman Decl., ¶ 6 Kaplan Decl., Ex. 8). Indeed, F+T was not at any of the 2016 evidentiary hearings in the Arbitration. (*Id.*). F+T did not participate in the post-hearing briefing. (*Id.*). Likewise, F+T did not participate in any communications with anyone concerning Dogra's coaching damages or any decision to accept the amount of coaching damages proffered by CAA. (*Id.*). F+T and Freedman had no participation in any discussions concerning any strategy relating to Dogra's damage calculations. (*Id.*). Additionally, Freedman had no involvement in the audit that was completed in 2019. (*Id.*). In fact, the Hardin Defendants have exchanged an expert report in the Malpractice Lawsuit which purports to disclaim any liability for malpractice. (Kaplan Decl., Ex. 7). Conspicuously absent from that report is any mention of anything that was done by Freedman or F+T.

Following the Hardin Defendants' departure from the Arbitration in 2018, attorney Lattinville remained as Dogra's attorney of record through the completion of the Arbitration in 2021. (Dogra Decl., ¶ 4). Likewise, Kyle Evans also actively participated and assisted in the Arbitration as a member of Dogra's legal team through the completion of the Arbitration in 2021. (*Id.*).

In 2020, Dogra brought in F+T to again represent Dogra in the Arbitration and resolve certain issues that remained in dispute. (Freedman Decl., ¶ 7; Kaplan Decl., Ex. 8). In August 2020, F+T became Dogra's attorney of record in the Arbitration for the first time. (*Id.*).[4] Between August 2020 and May 2021, F+T and Lattinville represented Dogra in the Arbitration through completion. (Freedman Decl., ¶ 7; Kaplan Decl., Ex. 8). While their work as attorneys of record was not insignificant,

members.

[4] Attorney Lattinville remained as Dogra's attorney of record.

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY BRYAN FREEDMAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

it had nothing to do with Dogra's coaching employment damages which had been resolved in 2016.  (*Id*.).   Rather, the remaining disputes involved pre-judgment interest, post-award interest, CAA's failure to collect commission from a certain client/player, and Dogra's entitlement to certain sub-categories of CAA revenue (not coaching employment revenue).  (*Id*.).  Freedman was not primarily involved  in that work. (*Id*.).  Rather, a vast majority of that work was undertaken by F+T partner Jesse Kaplan, Lattinville and Evans.  (*Id*.).

### D.    The Freedman Subpoena.

In August 2022, the Hardin Defendants' counsel informally requested that Freedman appear for a deposition.  (Kaplan Decl., ¶ 6).  Through initial meet and confer efforts, the Hardin Defendants stated that they desired to depose  Freedman on the following topics:

1.    Assignment of tasks from Mr. Dogra during the course of the arbitration proceeding;

2.    Communications relating to strategic decisions made during the course of the arbitration proceeding with respect to Mr. Dogra's claim for damages against CAA Sports, LLC;

3.    Mr. Freedman's assignment of tasks throughout Freedman + Taitleman [sic] throughout the course of the arbitration proceeding; and

4.    Communications throughout the course of the arbitration with Mr. Dogra's team, including Mr. Dogra, Bob Lattinville, Kyle Evans, and Mark Heligman, regarding RHA, CAA, the arbitration, and damages.

(Kaplan Decl., Ex. 4).

On September 13, 2022, the Hardin Defendants issued a Subpoena for Freedman's deposition (the "Freedman Subpoena") which was noticed for October 20, 2022.  (Kaplan Decl., ¶ 7, Ex. 5).  On September 15, 2022, F+T accepted service of the Freedman Subpoena on Freedman's behalf.  (Kaplan Decl., ¶ 8).  Because

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY BRYAN FREEDMAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

Freedman is a resident of Los Angeles County, the Freedman Subpoena sought compliance in Long Beach, California.  (Kaplan Decl., Ex. 5).

### E.    The Other Depositions.

The Hardin Defendants have or will depose plaintiff Dogra and a number of non-parties who were on Dogra's litigation team and were intimately involved in the underlying Arbitration.  (Kaplan Decl., ¶ 5).  In addition to Dogra, the Hardin Defendants have scheduled the depositions of the following witnesses: (i) Lattinville, Dogra's attorney of record throughout the entire Arbitration; (ii) Kyle Evans, a non-practicing attorney who was on Dogra's internal team for the entirety of the Arbitration; and (iii) Mark Heligman, a non-practicing attorney who was on Dogra's internal team for a significant portion of the Arbitration, including the entirety of 2016.  (*Id.*).

## II.    FREEDMAN IS ENTITLED TO A PROTECTIVE ORDER AND/OR TO QUASH THE FREEDMAN SUBPOENA

### A.    This Discovery Dispute Should be Resolved in the Central District of California.

As an initial matter, any dispute concerning the Freedman Subpoena should be resolved in the Central District of California.  A motion for a protective order concerning a deposition may be sought "in the court for the district where the deposition will be taken." Fed.R.Civ.P. 26(c)(i).  Likewise, a motion quash a subpoena must be made in the "the court for the district where compliance is required." Fed.R.Civ.P. 45(d)(3)(A).

Here, Freedman is a resident of Los Angeles County, California.  (Freedman Decl., ¶ 2).  The Freedman Subpoena seeks Freedman's deposition in Long Beach, California which is located in the Central District of California.  (Kaplan Decl., Ex. 5).  Accordingly, this Motion should be decided in the Central District of California ///.

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY BRYAN FREEDMAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

**B.** **The Deposition of Freedman - Opposing Counsel - is Improper Under _Shelton_ or _Friedman_.**

The Hardin Defendants cannot justify the highly disfavored practice of deposing opposing counsel. Depositions of an opposing party's attorney of record are generally disfavored and should be permitted "only in limited circumstances." _See LA Printex Indus., Inc. v. VF Corp._, 2014 WL 12587037, at *3 (C.D. Cal. Jan. 14, 2014) (quoting _American Cas. Co. of Reading, Pa. v. Krieger_, 160 F.R.D. 582, 588 (S.D. Cal. 1995)). A party's counsel is "presumptively entitled to a protective" order prohibiting his or her deposition unless the proponent of the deposition can rebut that presumption. _La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest_, No. SACV07250DOCANX, 2008 WL 11411715, at *6 (C.D. Cal. Feb. 28, 2008). Where a party seeks the deposition of opposing counsel, "[t]he near presumption in favor of a protective order may be overcome [only] where the attorney is a percipient witness to nonprivileged information" and other circumstances are present that warrant the deposition. _Johnson v. Couturier_, 261 F.R.D. 188, 193 (E.D. Cal. 2009). Courts generally hold that the party seeking to depose another party's attorney bears the burden of "establishing the propriety and need for the deposition." _Krieger_, 160 F.R.D. at 588; _Bybee Farms LLC v. Snake River Sugar Co._, 2008 WL 820186, at *1 n.1 (E.D. Wash. Mar. 26, 2008).

The Ninth Circuit has not adopted a standard governing when the deposition of opposing counsel may go forward. _See Yaroshinsky v. City of Los Angeles_, 2020 WL 6048177, at *2 (C.D. Cal. Sept. 15, 2020); _Littlefield v. Nutribullet, LLC_, 2017 WL 10438897, at *4 (C.D. Cal. Nov. 7, 2017). Many district courts in this Circuit, however, have adopted the Eighth Circuit test from _Shelton v. Am. Motors Corp._, 805 F.2d 1323 (8th Cir. 1986). _See, e.g., Sound View Innovations, LLC v. Hulu, LLC_, 2019 WL 9047211, at *7 (C.D. Cal. Nov. 18, 2019); _S.L. v. Upland Unified Sch. Dist._, 2019 WL 8163805, at *2 (C.D. Cal. Oct. 4, 2019); _Chao v. Aurora Loan Servs._, LLC, 2012 WL 5988617, at *3 (N.D. Cal. Nov. 26, 2012); _DiLorenzo v. Costco Wholesale Corp._,

13

243 F.R.D. 413, 415 (W.D. Wash. 2007); *Gilbert v. Money Mutual, LLC*, 2016 WL 3196605, at *6 (N.D. Cal. June 9, 2016).  Under *Shelton*, a party seeking to depose the opposing party's counsel must show that:

> (1) no other means exist to obtain the information than to depose opposing counsel;

> (2) the information sought is relevant and nonprivileged; and

> (3) the information is crucial to the preparation of the case.

*See Shelton*, 805 F.2d at 1327.

The Second Circuit has articulated a similar, yet slightly different, standard governing attorney depositions.  *See In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 71-72 (2d Cir. 2003). The *Friedman* test "takes into consideration all of the relevant facts and circumstances," such as "the need to depose the lawyer, the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation, the risk of encountering privilege and work-product issues, and the extent of discovery already conducted." *Id*. at 72.  Some courts in this Circuit have favored the Second Circuit's approach in *Friedman* over the *Shelton* test in the context of subpoenaing opposing counsel for a deposition.  *See Boeing Co. v. KB Yuzhnoye*, 2015 WL 12803452, at *9 (C.D. Cal. Nov. 3, 2015); *Younger Mfg. Co. v. Kaenon, Inc*., 247 F.R.D. 586, 588 (C.D. Cal. 2007).  Arguably, there is little to no materially difference between the two tests, both of which considers the necessity of deposing opposing counsel.  "Practically speaking, the two approaches are only 'slightly different' " *Monster Energy Co. v. Vital Pharm., Inc*., 2020 WL 2405295, at *8 (C.D. Cal. Mar. 10, 2020) (quoting Littlefield, 2017 WL 10438897, at *4).

The Hardin Defendants' cannot satisfy these standards.

### 1.   The information sought from Freedman is not crucial and is at most, tangentially relevant.[5]

---

[5] Because Dogra has filed a malpractice claim, Freedman does not dispute that the Hardin Defendants are entitled to at least some otherwise privileged information from the Arbitration proceeding.  While Freedman does not concede that there has been a

14

The information sought from Freedman is not crucial to the defense of the Malpractice lawsuit, and at most, has tangential relevance. As discussed, Freedman and F+T had extremely limited involvement in the Arbitration until 2020, approximately four year after the Hardin Defendants committed malpractice in 2016. Freedman's involvement in the Arbitration during the critical time period in 2016 was virtually non-existent.

Again, Freedman and F+T rendered no services to Dogra between late March 2016 and early 2020. (Freedman Decl., ¶ 6; Kaplan Decl., Ex. 8). Again, F+T was not at any of the 2016 evidentiary hearings in the Arbitration. (*Id*.). F+T did not participate in the Post-Hearing briefing. (*Id*.). Likewise, F+T did not participate in any communications with anyone concerning Dogra's coaching damages or any decision to accept the amount of coaching damages proffered by CAA. (*Id*.). F+T and Freedman had no participation in any discussions concerning any strategy relating to Dogra's damage calculations. (*Id*.). Additionally, Freedman had no involvement in the audit that was completed in 2019. (*Id*.). These facts are all confirmed by F+T's billing records. (Kaplan Decl., Ex. 8).

Not only have the Hardin Defendants not pointed to any evidence of Freedman or F+T's involvement during the relevant portions of the Arbitration, the Hardin Defendants' expert report does not rely on any purported facts related to Freedman or F+T. (Kaplan Decl., Ex. 7). In case there was any doubt, F+T's billing records confirm that Freedman and F+T were not involved in the relevant events concerning the Hardin Defendants' malpractice. (Kaplan Decl., Ex. 8).

### 2.    **There are other means to obtain the requested information.**

Even if Freedman was in possession of information that was both relevant and "crucial" to the Malpractice Litigation (which he does not), the Hardin Defendants

blanket "waiver" of the privilege, for at least the purpose of this Motion, Freedman does not contend that there are privilege concerns unless the Hardin Defendants seek privileged communications about the Malpractice Lawsuit, including privileged information in preparation for the Malpractice Lawsuit.

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY BRYAN FREEDMAN'S MOTION
FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

can get any information related to the Arbitration from a variety of other witnesses. Again, the Hardin Defendants have and will depose Dogra and the key participants on Dogra's internal legal team during the Arbitration. These other witnesses have detailed information about what occurred during the Arbitration, including key periods of time in 2016 and during the audit that was completed in 2019. The Hardin Defendants have not demonstrated that Freedman has any unique information concerning the Arbitration that is crucial, or even relevant, to their defense.

To the extent the Hardin Defendants had any questions about Freedman's role and participation in the Arbitration, the Hardin Defendants had the opportunity to question Dogra about that, and in fact did so. (Kaplan Decl., Ex. 3). If the Hardin Defendants wanted to know what Dogra discussed with Freedman during the course of the Arbitration, they could have asked Dogra about that during his deposition.

## C.      Freedman is Entitled to a Protective Order under Rule 26 Even if *Shelton* and *Friedman* do Not Apply.

Even if the *Shelton* or *Friedman* standards did not apply, Freedman is still entitled to a protective order under Rule 26 and/or to quash under Rule 45. Rule 45 governs non-party subpoenas. Under Rule 45(d)(3)(iv), the Court must quash or modify the subpoena if the subpoena subjects a person to undue burden. *See* Fed.R.Civ.P. 45(d)(3)(iv). The Court may also issue a protective order limiting discovery under Rule 26(c). *See* Fed. R. Civ. P. 26(c). The Court may issue a protective order to protect Freedman from "annoyance, embarrassment, oppression, or undue burden or expense." Fed.R.Civ.P. 26(c)(1). A court "must limit the frequency or extent of discovery otherwise allowed by [the Federal] rules" if "the discovery sought is unreasonably **cumulative or duplicative, or can be obtained from some other source** that is more convenient, less burdensome, or less expensive." Fed.R.Civ.P. 26(b)(2)(C)(Emphasis added).

To the extent that the Hardin Defendants seeks information about what transpired during the Arbitration, they can first attempt to obtain that information from

16

other sources more convenient and less burdensome than through the disfavored practice of deposing opposing counsel. As already discussed, there are a number of witnesses from Dogra's internal team that the Hardin Defendants have or will depose. These other witnesses have information of what transpired during the Arbitration, in particular facts that are central to the Malpractice Lawsuit.

**DEFENDANTS' POSITION:**

### I.    BACKGROUND

#### A. The Arbitration

Plaintiff, a sports agent, was employed by CAA Sports, LLC ("CAA") from January 1, 2012 through November 13, 2014, when he was terminated for egregious acts of misconduct and intolerable behavior. (Emery Decl. Ex. A - Answer ¶ 7.) RHA was engaged pursuant to a series of written fee agreements, the last of which was dated October 10, 2015, to combat CAA's allegations and convince a neutral Arbitrator that—despite Plaintiff's behavior—CAA's termination of Plaintiff's employment was wrongful and without cause, and that Plaintiff should be awarded significant damages for CAA's breach of the written employment agreement between Plaintiff and CAA. (*Id.*) During the course of the Arbitration, Plaintiff sought counsel from numerous attorneys (at least 9) and law firms (at least 4)—including the attorneys representing Plaintiff in the current lawsuit. (Emery Decl. Ex. E, at 2.)

After fifteen days of evidentiary hearings in the Arbitration occurring over a three-month period from February through April 2016, the Arbitrator issued an Opinion and Award in July 2016 finding that CAA's termination of Plaintiff's employment was without cause and that Plaintiff was entitled to various categories of damages under the employment agreement. (Emery Decl. Ex. A ¶ 9.) Among the categories of damages awarded to Plaintiff were coaching client contract revenues— even though Plaintiff did not himself represent any coaching clients. (*Id.* ¶ 11.) As a result of the Arbitration and accompanying opinions and awards, Plaintiff recovered damages in excess of $14 million from CAA—including $2,756,503 in coaching

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY BRYAN FREEDMAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

contract revenue damages. (Emery Decl. Ex. H; *see also* Emery Decl. Ex. A ¶ 12.)

**B. The Lawsuit**

Shortly after the conclusion of the Arbitration, Plaintiff—through attorneys who were also representing him in the Arbitration—filed suit against RHA alleging claims for malpractice and breach of contract. (Emery Decl. ¶ 2; *see also* Kaplan Decl. Ex. 1.) Despite the involvement of other attorneys and law firms, Plaintiff has only filed suit against RHA and alleges that RHA is solely responsible for any damages he allegedly suffered. Plaintiff alleges that, despite the unlikely win awarding him well over $14 million in damages, RHA caused him to be shorted several million dollars in coaching contract revenues to which he was entitled. (*See* Kaplan Decl. Ex. 1 ¶ 21.) These figures have yet to be substantiated by Plaintiff.

Plaintiff's malpractice allegations center on language included in Plaintiff's Post-Hearing Brief submitted in the Arbitration on June 7, 2016—following the fifteen days of live hearings from February through April. Plaintiff specifically complains of the following language included in the Post-Hearing Brief:

> Understated Coaching Revenue. The requested award accepts the coaching client revenue calculations made by CAA's damages consultant Paul K. Meyer, even though Mr. Meyer's analysis is subject to criticism.

(Kaplan Decl. Ex. 1 ¶ 14.) Notably, the origination of the now complained of Post-Hearing Brief language traces back to months before the submission of the Post-Hearing Brief. On March 4, 2016—day five of the Arbitration live hearings—Plaintiff's own expert testified under oath at the Arbitration that $2,756,503 was "fair and reasonable." (Emery Decl. Ex. B.) A few weeks after Dr. Rishe's testimony, Plaintiff and his attorneys began preparing a settlement demand. On March 23, 2016, after sharing back-and-forth drafts of the settlement demand amongst Plaintiff and his various attorneys, RHA sent a revised draft incorporating proposed comments and edits from Plaintiff and his attorneys. (Emery Decl. Ex. C.) During the course of preparing the settlement demand—specifically, on March 23, 2016—Plaintiff

18

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY BRYAN FREEDMAN'S MOTION
FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

consulted Bryan Freedman. (*See* Kaplan Decl. Ex. 8.) The March 23, 2016 draft settlement demand included the following language:

> Understated Coaching Revenue. The demand amount accepts the coaching client revenue calculations made by CAA's damages consultant Paul K. Meyer, even though Mr. Meyer's analysis is still subject to criticism and cross-examination.

(Emery Decl. Ex. C.) Two days later, RHA sent a final demand letter to CAA including the same "Understated Coaching Revenue" provision. (Emery Decl. Ex. D.)

Plaintiff now alleges that, by including nearly identical language in the Post-Hearing Brief as that crafted and approved by Plaintiff and his various attorneys months prior to June 7, 2016, RHA—and RHA alone—committed legal malpractice and caused harm to Plaintiff when, on July 18, 2016, the Arbitrator found that CAA breached its agreement with Plaintiff, awarding coaching contract damages in the amount of $2,756,503 because the Arbitrator found that Plaintiff agreed with the amount proffered by CAA.

### C. The Parties' Discovery Disputes

Since the early stages of discovery, Plaintiff has restricted RHA's access to responsive documents and communications between Plaintiff and the other lawyers representing him during the course of the Arbitration. On February 25, 2022, RHA filed a Motion to Compel Production of Improperly Withheld Documents based on Plaintiff's withholding of documents on the basis of attorney–client privilege. (Emery Decl. ¶ 4; *see also* Emery Decl. Ex. E.) Plaintiff sought to invoke the attorney–client privilege over years of legal advice given during the Arbitration and refused to produce (or allow other attorneys to produce) any documents or communications after October 31, 2018—the date on which Plaintiff alleges RHA no longer represented him. (*Id.*) Because Plaintiff placed such communications at issue, the Honorable Judge Hamilton of the United States District Court for the Eastern District of Missouri entered an order granting RHA's motion to compel and overruling Plaintiff's attorney–client privilege objections. (Emery Decl. ¶ 5; *see also* Emery Decl. Ex. F.)

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY BRYAN FREEDMAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

Despite Judge Hamilton's order, Plaintiff maintained "limited privilege [and] work-product" objections to thirty-four of RHA's Requests for Production while simultaneously refusing to provide a detailed privilege log for documents withheld on the basis of privilege during the time period in which the Arbitration was pending. (Emery Decl. Ex. G.) Instead, Plaintiff provided a single-row "categorical privilege log" covering broad categories of withheld documents spanning a time period of at least fifteen months during which the Arbitration was pending. (*Id.*) On September 20, 2022, RHA filed a Motion to Compel Production of Plaintiff's Privilege Log. (Emery Decl. ¶ 6; *see also* Emery Decl. Ex. G.) RHA's motion will be fully briefed by October 14, 2022.

During the course of meeting and conferring with Plaintiff in August 2022 concerning Plaintiff's deficient privilege log, RHA and Plaintiff began conferring regarding the deposition of Bryan Freedman. (Emery Decl. ¶ 8; *see also* Emery Decl. Ex. 9.) On September 13, 2022, RHA issued a Subpoena to Testify at a Deposition in a Civil Action to Freedman. (Emery Decl. ¶ 9; *see also* Kaplan Decl. Ex. 5.) Jesse Kaplan accepted service of the subpoena on behalf of Freedman on September 15, 2022. (Emery Decl. ¶ 9.) On September 20, 2022, counsel for Plaintiff and RHA met and conferred regarding RHA's subpoena to Freedman. (*Id.*) During the call, counsel for RHA reiterated that RHA has no intention of invading the attorney–client privilege for client communications in the current malpractice lawsuit but rather seeks to question Freedman concerning his demonstrable involvement throughout the course of the Arbitration.

## II.     ARGUMENT AND AUTHORITIES

### A. This Court Should Transfer the Motion to the Eastern District of Missouri (the Issuing Court) to Avoid Inconsistent Outcomes on Overlapping Discovery Issues.

The motion should be transferred to the Issuing Court because "exceptional

circumstances" exist. Federal Rule of Civil Procedure 45(f) provides that "[w]hen the court where compliance is required did not issue the subpoena, it may transfer a motion under this rule to the issuing court if the person subject to the subpoena consents or if the court finds exceptional circumstances." Fed. R. Civ. P. 45(f). The Advisory Committee Notes to Rule 45 describe when exceptional circumstances may be found:

> In the absence of consent, the court may transfer in exceptional circumstances, and the proponent of transfer bears the burden of showing that such circumstances are present. ***The prime concern should be avoiding burdens on local nonparties subject to subpoenas***, and it should not be assumed that the issuing court is in a superior position to resolve subpoena-related motions. In some circumstances, however, ***transfer may be warranted in order to avoid disrupting the issuing court's management of the underlying litigation, as when that court has already ruled on issues presented by the motion*** or the same issues are likely to arise in discovery in many districts. Transfer is appropriate only if such interests outweigh the interests of the nonparty served with the subpoena in obtaining local resolution of the motion.

Fed. R. Civ. P. 45 Advisory Committee's Note to 2013 Amendment (emphasis added). The "question before the Court on the motion to transfer involves a balancing test—whether the circumstances favoring transfer outweigh the interests of the nonparty served with the subpoena in obtaining local resolution of the motion." *E4 Strategic Sols., Inc. v. Pebble Ltd. P'ship*, SA MC 15-00022-DOC, 2015 WL 12746706, at *3 (C.D. Cal. Oct. 23, 2015) (citation omitted).

### 1. The Issuing Court Has Already Considered Overlapping Discovery Issues.

When the issuing court has already considered issues implicated in a subpoena-related motion, transfer is warranted. *Drennen v. Certain Underwriters at Lloyd's of London*, No. 2:20-mc-0330-DMG, 2021 WL 4978459, at *1 (C.D. Cal. Feb. 16, 2021) (finding transfer appropriate where the issuing court had already considered issues critical to the motion to quash and was thus familiar with the issues relevant to the disputed deposition and better positioned to determine whether the deposition should be permitted to proceed); *see also Moon Mountain Farms, LLC v. Rural Cmty. Ins.*

21

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY BRYAN FREEDMAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

*Co.*, 301 F.R.D. 426, 429 (N.D. Cal. 2014) (finding transfer appropriate where "issues raised in the motion to compel relate to orders and discovery from the underlying . . . case."); *E4 Strategic Sols., Inc.*, 2015 WL 12746706, at *4 (finding transfer appropriate where issuing court is in a better position to rule on the petition to quash due to "familiarity with the full scope of issues involved as well as any implications the resolution of the motion will have on the underlying litigation.").

Here, the Issuing Court has previously ruled on discovery issues concerning overlapping issues to those presented by Plaintiff in the motion—the discoverability of documents, communications, and information relating to the involvement of Plaintiff's numerous attorneys in the Arbitration. Further, RHA's Motion to Compel Production of Plaintiff's Privilege Log will soon be fully briefed and pending before the Issuing Court. The substantive issues raised in this motion are "intertwined with the intricacies of the underlying case," and the Issuing Court has been actively involved in determining the scope of relevant and permissible discovery. *See Le v. Zuffa, LLC*, No. 2:17-mc-00016-PSG, 2017 WL 11632246, at *4 (C.D. Cal. Mar. 17, 2017). Thus, the interest of judicial economy weighs in favor of transfer.

### 2. There Is Little to No Burden Imposed on Freedman by Transferring the Motion to the Issuing Court.

Freedman would face little to no burden by transferring the motion to the Issuing Court. When considering the burden on a subpoenaed party, courts consider various factors. For example, in *E4 Strategic Solutions, Inc.*, the Court addressed the subpoenaed party's argument that substantial interest in local resolution existed where: (1) the subpoenaed party was an individual, as opposed to a large corporation; (2) there was a significant difference in cost with respect to traveling to the Issuing Court; and (3) a transfer would impose a financial burden that would prevent counsel from litigating the motion in a way that counsel for the non-party believed to be in the best interest of their client. *E4 Strategic Sols., Inc.*, 2015 WL 12746706, at *5. The

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY BRYAN FREEDMAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

Court ultimately found that the subpoenaed party did not offer evidence of burden rising to the level needed to outweigh the exceptional circumstances warranting transfer. *Id.*

Though Freedman is an individual, the concerns associated with subjecting a non-party subpoenaed individual to transfer of a motion away from the district of compliance do not exist here. Rather, Freedman—though a non-party—is attorney of record for Plaintiff, and he has been admitted pro hac vice to practice in the lawsuit pending in the United States District Court for the Eastern District of Missouri. (Freedman Decl. ¶ 3.)

"[T]he cost of litigation alone does not constitute an unfair burden." *Agincourt Gaming, LLC v. Zynga, Inc.*, No. 2:14-cv-0708-RFB, 2014 WL 4079555, at *7 (D. Nev. Aug. 15, 2014). The Court in *E4 Strategic Solutions, Inc.* considered in its burden analysis that there was no indication that a hearing would be held by the Issuing Court on the motion, and if so, there was no indication that personal attendance would be required. *See E4 Strategic Sols., Inc.*, 2015 WL 12746706, at *5. Freedman cannot show that litigating the motion in the Issuing Court would even require travel. Indeed, the Issuing Court resolved RHA's Motion to Compel Production of Improperly Withheld Documents without a hearing. Further, Freedman's counsel for purposes of the motion—Jesse Kaplan—is already admitted pro hac vice in the lawsuit pending in the Issuing Court. *See id.* (considering as part of the burden analysis that subpoenaed party's counsel had already been admitted pro hac vice in the underlying action pending in the issuing court).

Freedman cannot show undue burden outweighing the importance of preventing inconsistent rulings, the risk of disrupting management of the lawsuit pending before the Issuing Court, and the preservation of judicial economy. Therefore, exceptional circumstances exist warranting transfer of the motion.

### B. In the Alternative, the Court Should Deny the Motion Because RHA Seeks Information Related to a Previously Concluded Case.

DISCOVERY MATTER: JOINT STIPULATION REGARDING NON-PARTY BRYAN FREEDMAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

The Federal Rules of Civil Procedure provide that "[a] party may . . . depose any person." Fed. R. Civ. P. 30(a)(1). There is no express prohibition against the taking of attorney depositions, including depositions of attorneys representing the opposing parties in the case. *Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986). The Ninth Circuit has not adopted a standard governing when the deposition of opposing counsel may go forward. However, many district courts in the Ninth Circuit have adopted the *Shelton* test set forth by the Eighth Circuit. *Littlefield v. Nutribullet, LLC*, No. CV 16-6894 MWF, 2017 WL 10438897, at *4 (C.D. Cal. Nov. 7, 2017); *see also Shelton*, 805 F.2d at 1327.

Since *Shelton*, the Eighth Circuit clarified in a subsequent decision that the heightened protection afforded by the *Shelton* test is inapplicable "to attorneys who represented a client in a completed case and then also happened to represent that same client in a pending case where the information known only by the attorneys regarding the prior concluded case was crucial." *Pamida, Inc. v. E.S. Originals*, 281 F.3d 726, 730 (8th Cir. 2002); *see also Dowie v. Fleishman-Hillard Inc.*, No. CV 05-3122-MMM, 2006 WL 8434394, at *2 (C.D. Cal. Jan. 27, 2006) ("Plaintiff should not be foreclosed from undertaking discovery to support his . . . claim, merely because [the defendant] elected to use the same attorney to handle both the criminal investigation and this civil litigation.").

### 1. *The Shelton Test Does Not Apply Because the Information Sought Relates to Terminated Litigation.*

The *Pamida* court determined that "[t]he concerns raised in *Shelton* regarding abuse of the discovery process . . . are not implicated in this case where [the defendants] seek relevant information uniquely known by [the plaintiff's] attorneys about prior terminated litigation, the substance of which is central to the pending case." *Pamida, Inc.*, 281 F.3d at 731. Rather, such proposed depositions should be evaluated under the ordinary discovery standards of the Federal Rules of Civil Procedure and any asserted privileges. *Id.*; *see also aaiPharma, Inc. v. Kremers Urban*

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY BRYAN FREEDMAN'S MOTION
FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

*Development Co.*, 361 F. Supp. 2d 770, 775 (N.D. Ill. Mar. 21, 2005) (finding that *Shelton* did not apply when the deposition of the plaintiff's attorneys would probe the attorneys' conduct during terminated litigation and instead considering the plaintiff's relevance, burden, and privilege objections).

The Issuing Court has already overruled Plaintiff's attorney–client privilege assertions for documents and communications relating to the various attorneys involved in the Arbitration. Further, there is no question Freedman—one of Plaintiff's attorneys throughout the course of the Arbitration that now serves as the basis for Plaintiff's malpractice allegations against RHA—is the source of relevant and uniquely known information concerning the events of the Arbitration, including strategic decisions made along the way. Plaintiff and his representatives consulted Freedman throughout various critical points of the Arbitration. What did they talk about? What advice did Freedman supply? RHA is entitled to know. *See ATS Prods., Inc. v. Champion Fiberglass, Inc.*, No. 13-cv-02403-SI, 2015 WL 3561611, at *6 (N.D. Cal. June 8, 2015) ("To permit a fact witness to evade a deposition simply because he acted as an attorney in a prior case would invite parties to retain the same counsel in subsequent cases to avoid revealing information that would otherwise be discoverable."). Therefore, under *Pamida* and the general standards of the Federal Rules of Civil Procedure, Freedman's motion should be denied.

     2. *Even Under the Shelton and Friedman Standards—Which RHA Does Not Concede Apply to the Present Analysis—Freedman's Deposition Is Appropriate.*

Even under the more stringent *Shelton* standard, RHA is entitled to take Freedman's deposition. Pursuant to *Shelton*, the court must consider the relevance of the attorney-deponent's testimony and the privilege concerns it raises, whether other means to obtain the information are available, and whether the attorney's testimony is crucial to the case. *Shelton*, 805 F.2d at 1327; *see also Littlefield*, 2017 WL 10438897, at *5. The less stringent *Friedman* standard set forth by the Second Circuit

25

"takes into consideration all of the relevant facts and circumstances," such as "the need to depose the lawyer, the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation, the risk of encountering privilege and work-product issues, and the extent of discovery already conducted." *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 72 (2d Cir. 2003).

As discussed above, there is no question that Freedman possesses relevant information as one of the numerous attorneys consulted by Plaintiff during the Arbitration. (*See* Kaplan Decl. Ex. 8.) Significantly, Freedman's own billing records suggest that he was consulted by Plaintiff in March of 2016 during the drafting of the settlement demand that included nearly identical language to that Plaintiff now complains of in his malpractice allegations against RHA. (*Id.*)

Further, Freedman is in possession of unique knowledge and information that is not available through other means. Since the early stages of discovery, Plaintiff has resisted RHA's efforts to obtain information concerning the involvement and conduct of Plaintiff's various attorneys. And despite the Issuing Court overruling Plaintiff's privilege assertions, the parties continue to dispute Plaintiff's remaining privilege assertions relating to communications between Plaintiff and Freedman's law firm occurring prior to the filing of this lawsuit and while the Arbitration was still pending. Plaintiff's own resistance throughout discovery of this lawsuit has inhibited RHA from obtaining relevant and crucial information concerning the Arbitration and the conduct of the attorneys involved. Freedman is in a superior position and the best source for information concerning his involvement, any strategic decisions made, and counsel provided to Plaintiff during the course of the Arbitration.

Finally, Freedman's testimony is crucial to this case. Despite the involvement of numerous attorneys—including Freedman—in the Arbitration, Plaintiff has only asserted malpractice claims against RHA. As a fact witness and one of the attorneys involved in the Arbitration that now serves as the factual foundation for Plaintiff's malpractice claims against RHA, Freedman cannot evade a deposition simply because

he also represents Plaintiff in this lawsuit. Such unusual circumstances of Plaintiff's own making do not preclude RHA's ability to obtain crucial testimony from a knowledgeable fact witness.

### III. CONCLUSION

Freedman cannot show undue burden outweighing the importance of preventing inconsistent rulings, the risk of disrupting management of the lawsuit pending before the Issuing Court, and the preservation of judicial economy. Therefore, exceptional circumstances exist warranting transfer of the motion to the United States District Court for the Eastern District of Missouri.

In the alternative, Freedman's motion should be denied under *Pamida* and the general standards of the Federal Rules of Civil Procedure.

Dated: October 11, 2022            FREEDMAN + TAITELMAN, LLP


                                   By: */s/ Jesse A. Kaplan*
                                   Bryan J. Freedman, Esq.
                                   Jesse A. Kaplan, Esq.
                                   FREEDMAN + TAITELMAN, LLP
                                   Attorneys for Non-Party Bryan Freedman



Dated: October 11, 2022            FORD, WALKER, HAGGERTY & BEHAR

                                   By: */s/ Katherine M. Harwood*
                                   Katherine M. Harwood, Esq.
                                   Attorneys for Defendants,
                                   RUSTY HARDIN and
                                   RUSTY HARDIN AND ASSOCIATES, LLP

27

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY BRYAN FREEDMAN'S MOTION
FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA