FREEDMAN + TAITELMAN, LLP
Bryan J. Freedman, Esq. (SBN: 151990)
bfreedman@ftllp.com
Jesse A. Kaplan, Esq. (SBN: 255059)
jkaplan@ftllp.com
1801 Century Park West, 5th Floor
Los Angeles, CA 90067
Telephone: (310) 201-0005
Facsimile: (310) 201-0045

Attorneys for Non-Party Jesse Kaplan

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEN DOGRA, an individual<br><br>  Plaintiff/Counter-Respondent<br><br>vs.<br><br>RUSTY HARDIN; RUSTY HARDIN AND ASSOCIATES, LLP; and DOES 1 through 20, inclusive,<br><br>  Defendants/Counterclaimants. | Case No.: 2:22-mc-00193-DSF-PLA<br><br>Assigned to: Judge Dale S. Fischer<br>Referred to: Magistrate Judge Paul L. Abrams<br><br>USDC, E.D. Missouri<br>Case No. Case No.: 4:21-CV-00949<br><br>**DISCOVERY MATTER: JOINT STIPULATION REGARDING NON-PARTY JESSE KAPLAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA**<br><br>[Notice of Motion for Protective Order and Quash the Subpoena; Declarations of Jesse A. Kaplan, Ben Dogra and Victoria Emery in Support of Motion; Application to File Under Seal; Declaration of Jesse A. Kaplan in Support of Application to File Under Seal; and [Proposed] Order re Application to File Under Seal filed concurrently]<br><br>Date:    November 30, 2022<br>Time:    10:00 a.m.<br>Magistrate Judge: Paul L. Abrams<br>Courtroom: 780 |

# TABLE OF CONTENTS

I.   NON-PARTY KAPLAN'S INTRODUCTORY STATEMENT ........................1

DEFENDANTS' INTRODUCTORY STATEMENT ...................................... 2

II.  THE KAPLAN SUBPOENA AT ISSUE ..................................................4

NON-PARTY KAPLAN'S POSITION: ...........................................................4

    I.   FACTUAL BACKGROUND..................................................................4

    A.  The Underlying Arbitration. .............................................................4

    B.  The Malpractice Lawsuit. ................................................................5

        1.   The Malpractice Claim..............................................................5

        2.   The Fee Dispute. .......................................................................8

    C.   Kaplan's Limited Role in the Arbitration.......................................9

    D.  The Kaplan Subpoena.....................................................................10

    E.  The Other Depositions. ...................................................................10

    F.  The Meet and Confer and the Evans Deposition Testimony at Issue. .......11

III. KAPLAN IS ENTITLED TO A PROTECTIVE ORDER AND/OR TO QUASH THE KAPLAN SUBPOENA ...............................................................12

    A.  This Discovery Dispute Should be Resolved in the Central District of California.................................................................12

    B.  The *Pamida* Test Is Inapplicable Because Kaplan Does Not Have Unique Information About the Arbitration that is Central to the Malpractice Lawsuit...............................................................13

    C.  The Deposition of Kaplan - Opposing Counsel - is Improper Under *Shelton* or *Friedman*.......................................................14

        1.   The information sought from Kaplan is not crucial and is at most, tangentially relevant...........................................................16

        2.   Therre are other means to obtain the requested information. .............17

    C.  Kaplan is Entitled to a Protective Order under Rule 26 Even if *Shelton* and *Friedman* do Not Apply. ........................................17

DEFENDANTS' POSITION: .................................................................18

I. BACKGROUND ...............................................................................18

   A.   The Arbitration ...................................................................................... 18

   B.   The Lawsuit ........................................................................................... 18

   C.   The Parties' Discovery Disputes ........................................................... 20

II. ARGUMENT AND AUTHORITIES ............................................................... 21

   A.   This Court Should Transfer the Motion to the Eastern District of Missouri (the Issuing Court) to Avoid Inconsistent Outcomes on Overlapping Discovery Issues. ................................................................ 21

        1.   *The Issuing Court Has Already Considered Overlapping Discovery Issues.* .............................................................................. 22

        2.   *There is Little to No Burden Imposed on Mr. Kaplan by Transferring the Motion to the Issuing Court.* ................................. 20

   B.   In the Alternative, the Court Should Deny the Motion Because RHA Seeks Information Related to a Previously Concluded Case. ................... 24

        1.   *The Shelton Test Does Not Apply Because the Information Sought Relates to Terminated Litigation.* ......................................... 22

        2.   *Even Under the Shelton and Friedman Standards—Which RHA Does Not Concede Apply to the Present Analysis—Mr. Kaplan's Deposition is Appropriate.* ................................................ 20

III. DEFENDANTS' CONCLUSION .................................................................. 27

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY JESSE KAPLAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

## JOINT STIPULATION REGARDING NON-PARTY JESSE KAPLAN MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

Pursuant to Local Rule 37-2, non-party Jesse Kaplan and and Defendants Rusty Hardin and Rusty Hardin and Associates, LLP (the "Hardin Defendants") submit this joint stipulation (the "Joint Stipulation") relating to Kaplan's motion for a protective order and to quash a certain Subpoena to Kaplan.  Following a conference of counsel conducted on October 21, 2022, the parties were unable to reach agreement with respect to the discovery dispute at issue.

### I.

### NON-PARTY KAPLAN'S INTRODUCTORY STATEMENT

Non-party Jesse Kaplan seeks a protective order and/or to quash a subpoena that purports to require Kaplan to testify at a deposition in an action currently pending in the Eastern District of Missouri entitled *Ben Dogra v. Rusty Hardin, et al.*, Case No.: 4:21-CV-00949 (the "Malpractice Lawsuit").  Kaplan, who is attorney of record for plaintiff Ben Dogra in the Malpractice Lawsuit, should not be deposed in that action.

The Malpractice Lawsuit centers around a malpractice claim based on discrete conduct by Rusty Hardin and Rusty Hardin and Associates, LLP  (the "Hardin Defendants") in a certain arbitration proceeding.  In an obvious attempt to harass and drive a wedge between Dogra and his counsel, the Hardin Defendants have subpoenaed two of Dogra's attorneys of record in the Malpractice Lawsuit, and seek their depositions.[1] The Hardin Defendants cannot satisfy their burden of rebutting the presumption that it is improper to depose opposing counsel.  First, the information sought from Kaplan is not crucial to the defense of the Malpractice lawsuit, and at most, has tangential relevance.  In pretextual and superficial fashion, the Hardin

---

[1] A similar motion concerning the deposition of Dogra's counsel, Bryan Freedman, is also pending.

1

Defendants attempt to justify the Kaplan deposition based on the mere fact that Kaplan also represented Dogra in connection with the underlying arbitration that lasted over six years.  The Hardin Defendants, however, ignore that Kaplan's representation was both extremely limited and was completely unrelated to the specific acts or transactions that occurred in **2016** that form the basis for liability. **Kaplan did not even represent Dogra until 2020**.

Second, even if Kaplan had information that was both relevant and "crucial" to the Malpractice Lawsuit (which he does not), the Hardin Defendants can get any information related to the Arbitration from a variety of other witnesses.  Notably, the Hardin Defendants have deposed Dogra and Dogra's entire legal team from the underlying arbitration.  Kaplan does not have any unique information that the Hardin Defendants cannot learn from others who were involved in the arbitration.

Accordingly, the Kaplan subpoena should be quashed and Kaplan should not be deposed.

## DEFENDANTS' INTRODUCTORY STATEMENT

The Hardin Defendants (collectively, "RHA") seek Jesse Kaplan's (and Freedman's) deposition(s). He is one of many attorneys who represented plaintiff Ben Dogra during the "certain" arbitration proceeding (the "Arbitration"). Plaintiff does not (and cannot) dispute that his attorneys in the current Malpractice Lawsuit were among those who represented him in the Arbitration despite the contention above that Kaplan's representation did not begin until **2020!** We have billing statements demonstrating that both Mr. Kaplan and Mr. Freedman charged Dogra for time spent representing him from the inception of the Arbitration through the alleged malpractice in 2016. We attach the pertinent billing statements as Exhibit F and incorporate them into this response.[2] Their post-2016 representation bears not only on the amount of

---

[2] In the Malpractice Lawsuit (pending in the Eastern District of Missouri), the Court ordered Plaintiff to produce documents from Mr. Kaplan and his law firm, Freedman + Taitelman, overruling Plaintiff's assertion of the attorney/client privilege. Plaintiff's arguments addressed and overruled by the Eastern District of Missouri in its discovery order, attached hereto as Exhibit C and incorporated herein, are the same or similar to

2

alleged damages claimed by Dogra as a result of RHA's alleged malpractice, but also on Dogra's contract claim that he asserts in the Malpractice Lawsuit.

The principle act of claimed malpractice centers on the inclusion of a single portion in a 122-page post-hearing brief which states as follows:

> CAA then prepared a rebuttal report, which was critical of Dr. Rishe's data and findings. Using CAA data, the rebuttal report calculated the coaching revenue represented by Section L(i) collected from November 14, 2014 to November 13, 2017 to amount to **$2,756,503**. At the hearing, CAA's rebuttal expert stood by his analysis and this amount. [Footnote] **Although this amount is subject to criticism, Claimant has accepted this figure for the purposes of this requested award**.

RHA's position in the Malpractice Lawsuit is that Dogra himself and his many lawyers either were aware of the inclusion of the sentence or had the opportunity to review it and all agreed to it. In fact, the author of the sentence is still in dispute. Of course, we could always wait and call Mr. Kaplan and/or Mr. Freedman live at trial as they are counsel of record and presumably will be there. But depending on what they say at their depositions, calling them at trial *may* be unnecessary, thereby removing ethical concerns for these attorneys. On the other hand, Mr. Kaplan or Mr. Freedman may have either approved the language or, at least, had the opportunity to do so or perhaps written the sentence. They also may have unique knowledge about the events giving rise to the Contract claim and damages.

Finally, because the Eastern District of Missouri has already ruled on related issues concerning the discoverability of Dogra's communications with his law firm during the Arbitration, the motion should be transferred to the Eastern District of Missouri, as permitted under Rule 45(f). Mr. Kaplan is no stranger to that District. He has applied for and been granted admission pro hac vice there and is representing Plaintiff before that Court (as is his co-counsel here, Mr. Freedman).

those raised by Kaplan in this motion.

3

Plaintiff's motion should be either denied or transferred to the Court overseeing the Malpractice Lawsuit in the Eastern District of Missouri.

## II.

## <u>THE KAPLAN SUBPOENA AT ISSUE</u>

<u>NON-PARTY KAPLAN'S POSITION</u>:

I.        <u>FACTUAL BACKGROUND</u>

    A.        <u>The Underlying Arbitration</u>.

The present lawsuit is based on a multi-year arbitration proceeding that plaintiff Ben Dogra ("Dogra") commenced against his former employer, CAA Sports LLC ("CAA").    In February 2015, the Hardin Defendants initiated an arbitration proceeding on Dogra's behalf against CAA by filing a Demand for Arbitration with the American Arbitration Association ("AAA") in St. Louis, Missouri entitled *Ben Dogra v. CAA Sports, LLC*, AAA Case No. 01-15-0002-7781 (the "Arbitration"). (Kaplan Decl., Ex. 1 [Petition, ¶ 10]).  Initially, Dogra was represented by the Hardin Defendants in the Arbitration.  (Dogra Decl., ¶ 3).

In summary, the Arbitration concerned CAA's wrongful termination of Dogra, a former CAA employee and head of CAA's football division, and CAA's breach of a certain written employment agreement between Dogra and CAA (the "Employment Agreement").  (Kaplan Decl., Ex. 2 [Demand for Arbitration]).  In the Arbitration, Dogra sought to recover damages from CAA based on, among other things, CAA's breach of the Employment Agreement and failure to pay Dogra various revenues related to its representation of football players and coaches.  (*Id*.).

A multi-day evidentiary hearing occurred in the Arbitration on various dates in February through April 2016.  (Kaplan Decl., Ex. 1 [Petition, ¶ 12]).  In July 2016, the arbitrator issued an initial Opinion and Award finding, among other things, that CAA had breached the Employment Agreement.  (Kaplan Decl., Ex. 1 [Petition, ¶¶ 15-17]).  Despite that award, many items, including the scope and calculation of damages remained unresolved.  Indeed, the Arbitration did not conclude until mid-

4

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY JESSE KAPLAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

2021, and included six supplemental opinions and awards.  (Dogra Decl., ¶ 2).

The Hardin Defendants were lead trial counsel and attorney of record in the Arbitration through October 2018.  (Dogra Decl., ¶ 3).  Non-party Robert Lattinville, who is not a litigator, was also attorney of record in the Arbitration through its entirety.  (*Id.*).  Dogra also had an internal group of non-practicing attorneys who assisted the Hardin Defendants and Dogra  in the Arbitration, including non-parties Kyle Evans and Mark Heligman.  (*Id.*).  As will be discussed in more detail, Freedman + Taitelman, LLP ("F+T") and Jesse Kaplan had a much more limited role in the Arbitration.

## B.    The Malpractice Lawsuit.

In July 2021, Dogra commenced a lawsuit against the Hardin Defendants in Missouri State Court based on the Hardin Defendants' malpractice and retention of a "flat fee" that Dogra had paid.  (Kaplan Decl., Ex. 1).  The Hardin Defendants removed the lawsuit to the United States District Court for the Eastern District of Missouri where the lawsuit is currently pending. (Kaplan Decl., ¶ 2).  Non-party Jesse Kaplan is Dogra's attorney of record in the Malpractice Lawsuit.  (Kaplan Decl., ¶ 3). Kaplan, who is a California resident and attorney, was admitted Pro Hac Vice to practice in the Malpractice Lawsuit.  (*Id.*, ¶¶ 2-3).

### 1.    The Malpractice Claim.

In Dogra's Petition in the Malpractice Lawsuit, Dogra asserts a claim for malpractice against the Hardin Defendants based on discrete negligence that occurred in 2016 in connection with a post-hearing brief that was submitted to the Arbitrator by the Hardin Defendants.  While the Arbitration was multifaceted and involved multiple claims and issues, almost all of the issues in the Arbitration are irrelevant to the Malpractice Lawsuit.  Rather, the facts and issue that forms the basis for Dogra's malpractice claim are fairly narrow and discrete – a stipulation to certain measure of damages in a post-hearing brief (the "Post-Hearing Brief") that was submitted to the Arbitrator in **June 2016**.

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY JESSE KAPLAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

In June 2016, after the evidentiary hearing in the Arbitration, the Hardin Defendants submitted a Post-Hearing Brief to the Arbitrator.  (Kaplan Decl., Ex. 1 [Petition, ¶ 13]).  Among other things, the Post-Hearing Brief stated that CAA's expert concluded that the coaching employment revenue at issue[3] purportedly totaled $2,756,503.  (*Id*.).  Remarkably, the Post-Hearing Brief prepared by the Hardin Defendants stipulated and agreed to CAA's proffered $2,756,503 figure for the amount of CAA's coaching employment revenue that Dogra was entitled to under the Employment Agreement.  (*Id*.).  Moreover, the Hardin Defendants failed to request an accounting or audit of CAA's coaching revenue, or to at least reserve Dogra's rights to do so.  (*Id*.).  Specifically, the Post-Hearing Brief stated in relevant part as follows:

> CAA then prepared a rebuttal report, which was critical of Dr. Rishe's data and findings.  Using CAA data, the rebuttal report calculated the coaching revenue represented by Section L(i) collected from November 14, 2014 to November 13, 2017 to amount to **$2,756,503**. At the hearing, CAA's rebuttal expert stood by his analysis and this amount. [Footnote] **Although this amount is subject to criticism, Claimant has accepted this figure for the purposes of this requested award**.

(Kaplan Decl., Ex. 1 [Petition, ¶ 13])(Emphasis Added).

The Post-Hearing Brief also stated in relevant part as follows:

> Understated Coaching Revenue. **The requested award accepts the coaching client revenue calculations made by CAA's damages consultant** Paul K. Meyer, even  though Mr. Meyer's analysis is subject to criticism.

(Kaplan Decl., Ex. 1 [Petition, ¶ 14])(Emphasis added).

On July 18, 2016, the Arbitrator issued an Opinion and Award.  (Kaplan Decl., Ex. 1 [Petition, ¶ 15]).  In the Opinion and Award, the Arbitrator found, among other things, that based on CAA's breach of contract, Dogra was entitled to certain CAA

---

[3] CAA represented both players and coaches and would commission a percentage of their earnings.  Among other things, CAA commissioned a percentage of their football coach clients' employment income from the university or NFL team that employed each coach.

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY JESSE KAPLAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

coaching client revenues, and awarded a sum certain amount of $2,756,503 in damages based on CAA's failure to pay Dogra CAA's coaching client revenues. (*Id*.).[4]  Of particular importance, the Arbitrator found that **Dogra agreed with the amount proffered by CAA in his Post-Hearing Brief**.  (Kaplan Decl., Ex. 1 [Petition, ¶¶ 15-16])(Emphasis added).

The Arbitrator also found that CAA had breached the Employment Agreement by failing to pay Dogra other categories of CAA's revenues such as marketing revenue, consulting revenue and player contract revenue.  (Kaplan Decl., Ex. 1 [Petition, ¶17]).  For all categories of claims in which the amount of damages were "in dispute", the Arbitrator ordered the parties to undertake an "audit" to calculate those damages.  (*Id*.).

In August and September 2016, the Hardin Defendants sought clarification from the Arbitrator as to certain issues raised in the Opinion and Award, including clarification as to Dogra's ability to recover additional coaching revenue through an audit.  (Kaplan Decl., Ex. 1 [Petition, ¶ 18]).  In doing so, the Hardin Defendants attempted to retract their prior stipulation to the $2,756,503 figure, and stated that Dogra was actually entitled to coaching revenue that exceeded that amount.  (*Id*.).

In September 2016, the Arbitrator issued a First Supplemental Opinion and Award.  (Kaplan Decl., Ex. 1 [Petition, ¶ 19]).  In the First Supplemental Opinion and Award, the Arbitrator summarized the particular dispute at issue as "whether there is any opportunity for Claimant [Dogra] to increase this Award amount, since the Award was stated as a sum certain." (*Id*.). The Arbitrator ruled that since Dogra had "**specifically agreed**" in his Post-Hearing Brief to the $2,756,503 figure advanced by CAA relative to coaching employment revenues, Dogra was bound to that agreement, and could not potentially increase that figure through an audit of CAA's records. (*Id*.)(Emphasis added). Specifically, the Arbitrator ruled as follows:

[4] The Arbitrator also awarded Dogra other measures of damages that are not at issue in the Malpractice Lawsuit.

7

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY JESSE KAPLAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

CAA argues that Dogra gets only $2,756,503 in coaching revenue. This figure is a sum certain and cannot be increased nor subject to audit. [¶] Dogra argues that he is not limited to receiving only $2,756,503. He claims that the figure is subject to audit which audit may reveal that he may be entitled to more coaching revenue. [¶] **Given that Dogra specifically agreed to this figure in his Post-hearing brief, the Award reflects this agreement. It is too late for the Claimant to take back his agreement with this figure**. As a result, the awarded sum certain for coaching revenue remains as stated in the Award.

(Kaplan Decl., Ex. 1 [Petition, ¶ 19])(Emphasis added).

In 2018 and 2019, Dogra and CAA undertook an audit of CAA's accounting records to determine the extent of CAA's client revenues. Unfortunately, the audit confirmed that the $2,756,503 stipulated amount that purportedly reflected CAA's coaching employment revenue was grossly understated. (Kaplan Decl., Ex. 1 [Petition, ¶¶ 20-21]). Dogra alleges that the Hardin Defendants were negligent in stipulating and agreeing to the amount of coaching damages proffered by CAA and its purported expert, and not preserving Dogra's right to an audit or accounting. (Kaplan Decl., Ex. 1 [Petition, ¶ 22]).

### 2.    The Fee Dispute.

Dogra also seeks to recover at least a portion of a "flat fee" he paid to the Hardin Defendants to represent him in the Arbitration. In or around the fall of 2015, the Hardin Defendants agreed to charge Dogra a purported $1.575 million "flat fee" (the "Fee") for their representation in the Arbitration. (Kaplan Decl., Ex. 1 [Petition, ¶ 26]). Specifically, in exchange for the $1.575 million Fee, the Hardin Defendants agreed to serve as "lead counsel through the resolution in arbitration or a trial court in your affirmative arbitration claims against [CAA] in [the Arbitration] seeking, among other things, enforcement of your employment agreement with CAA" (the "Fee Agreement"). (*Id.*).

Though Dogra paid the Hardin Defendants the entire Fee well before the contemplated engagement was completed, the Fee was not non-refundable and was not earned upon receipt. (Kaplan Decl., Ex. 1 [Petition, ¶ 27]). Stated differently, the

8

Hardin Defendants were required to refund at least a portion of the Fee if they did not serve as lead counsel through the resolution of the Arbitration, and in turn, did not perform services sufficient to merit the retention of the entire Fee. (*Id.*).

In **October 2018**, the Hardin Defendants ceased representing Dogra in any capacity in the Arbitration or any related proceeding. (Dogra Decl., ¶ 4). Again, the Arbitration continued through May 2021, and Dogra was required to have attorneys other than the Hardin Defendants represent him in the Arbitration and several related proceedings through conclusion. Because the Hardin Defendants did not serve as lead counsel through the resolution of the Arbitration, they were required to refund some portion of the Fee that they had already collected but was not fully earned. (Kaplan Decl., Ex. 1 [Petition, ¶ 33]).

### C.    Kaplan's Limited Role in the Arbitration.

Kaplan and F+T had limited involvement in the Arbitration, especially from its inception in February 2015 through the summer of 2020. (Kaplan Decl., ¶¶ 6-9). Prior to August 2020, Kaplan and F+T were never attorneys of record in the Arbitration. (*Id.*). Initially, F+T, but not Kaplan, provided some consultation to Dogra and the Hardin Defendants on limited issues unrelated to the facts at issue in the Malpractice Lawsuit in 2015 when the Arbitration was in its infancy. (Kaplan Decl., ¶ 6). Notably, **Kaplan had no involvement in the Arbitration until April 2020**, almost four (4) years after the Hardin Defendants submitted the Post-Hearing Brief in question. (Kaplan Decl., ¶ 7). F+T and Kaplan did not participate in the post-hearing briefing in 2016. (Kaplan Decl., ¶ 6). Likewise, F+T and Kaplan did not participate in any communications with anyone concerning Dogra's employment coaching damages or any decision to accept the amount of coaching damages proffered by CAA in 2015 or 2016. (*Id.*). F+T and Kaplan had no participation in any discussions concerning any strategy relating to Dogra's damage calculations prior to the 2016 Award. (*Id.*). Additionally, F+T and Kaplan had no involvement in the audit that was completed in 2019. (*Id.*).

Following the Hardin Defendants' departure from the Arbitration in 2018, attorney Lattinville remained as Dogra's attorney of record through the completion of the Arbitration in 2021.  (Dogra Decl., ¶ 4).  Likewise, Kyle Evans also actively participated and assisted in the Arbitration as a member of Dogra's legal team through the completion of the Arbitration in 2021.  (*Id*.).

In 2020, Dogra brought in F+T to again represent Dogra in the Arbitration and resolve certain issues that remained in dispute.  (Kaplan Decl., ¶ 8).  In August 2020, F+T became Dogra's attorney of record in the Arbitration for the first time.  (Kaplan Decl., ¶ 8).[5]  Between August 2020 and May 2021, F+T and Lattinville represented Dogra in the Arbitration through completion.  (Kaplan Decl., ¶ 9).  While their work as attorneys of record was not insignificant, it had nothing to do with Dogra's coaching employment damages which had been resolved in 2016.  (*Id*.).  Rather, the remaining disputes involved pre-judgment interest, post-award interest, CAA's failure to collect commission from a certain client/player, and Dogra's entitlement to certain sub-categories of CAA revenue (not coaching employment revenue).  (*Id*.).

### D.   The Kaplan Subpoena.

On October 17, 2022, the Hardin Defendants issued a Subpoena for Kaplan's deposition (the "Kaplan Subpoena") which was noticed for November 4, 2022.  (Kaplan Decl., ¶ 13, Ex. 6).  Because Kaplan is a resident of Los Angeles County, the Kaplan Subpoena sought compliance in Long Beach, California.  (Kaplan Decl., Ex. 6).  To date, the Hardin Defendants have not served the Kaplan Subpoena on Kaplan.  (Kaplan Decl., ¶ 13).

### E.   The Other Depositions.

The Hardin Defendants have deposed plaintiff Dogra and a number of non-parties who were on Dogra's litigation team and were intimately involved in the underlying Arbitration.  (Kaplan Decl., ¶ 10).  In addition to Dogra, the Hardin

---

[5] Attorney Lattinville remained as Dogra's attorney of record.

10

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY JESSE KAPLAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

Defendants have deposed of the following witnesses: (i) Bob Lattinville, Dogra's attorney of record throughout the entire Arbitration; (ii) Kyle Evans, a non-practicing attorney who was on Dogra's internal team for the entirety of the Arbitration; and (iii) Mark Heligman, a non-practicing attorney who was on Dogra's internal team for a significant portion of the Arbitration, including the entirety of 2016. (*Id*.).

### F.   The Meet and Confer and the Evans Deposition Testimony at Issue.

In October 2022, the parties met and conferred about the Kaplan deposition. (Kaplan Decl., ¶ 11-12, Ex. 3).   The Hardin Defendants claimed that the Evans deposition revealed that there was some purported need to depose Kaplan based on information that Evans did not know.   (Kaplan Decl., Ex. 3).   Specifically, Defendants' counsel stated the following:

> We received the deposition transcript of Kyle Evans. He testified that there were several facts related to Mr. Dogra's **perceived claim of additional coaching client revenue that he just didn't know**. And on a number of points, including representations made to Arbitrator Vaughn about allegedly outstanding amounts of coaching client revenue, he said **that we'd need to ask [Kaplan] for the details**. This is also reflected in many of the documents used in that deposition and otherwise produced in this lawsuit.

(Kaplan Decl., Ex. 3).

In response, the Hardin Defendants were asked to specifically identify what information they would need to ask Kaplan based on Evans' testimony. (*Id*.).   The Hardin Defendants referenced pages 260-285 of Evans' deposition transcript. (*Id*.).

The Hardin Defendants have misconstrued Evans' testimony.

The portion of Evans' testimony cited by the Hardin Defendants focused on a letter brief that F+T prepared and submitted to the arbitrator in **October 2020** concerning a number of unresolved issues, namely a short section from the brief whereby Dogra sought to recover a portion of CAA's coaching **marketing and**

11

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY JESSE KAPLAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

**consulting** commissions revenue. (Kaplan Decl., Ex. 4 [Evans Deposition Transcript]). This October 2020 brief was written almost four (4) years after Defendants' malpractice in connection with a June 2016 Post-Hearing Brief. (Kaplan Decl., Ex. 5).

In particular, the Hardin Defendants questioned Evans about language in the October 2020 brief that stated in passing that Dogra was precluded from recovering between approximately $1.4 to $2.1 million in coaching employment revenue. (Kaplan Decl., Ex. 4).[6] Evans never testified that he lacked information about the coaching employment revenue figures or that the Hardin Defendants would have to ask Kaplan (or anyone else) about those figures. (*Id*.). Evans testimony was clear that he personally provided those figures for the October 2020 brief, and that those figures were based on the audit. (*Id*.). There were no questions about those figures that Evans could not answer. (*Id*.). There were no questions about those figures where Evans testified that the Hardin Defendants would need to ask Kaplan for further details or information. (*Id*.). The only subject matter that Evans was not entirely sure of was who actually put pen to paper and drafted certain portions of the October 2020 brief. (*Id*.).

**II.     KAPLAN IS ENTITLED TO A PROTECTIVE ORDER AND/OR TO QUASH THE KAPLAN SUBPOENA**

**A.     This Discovery Dispute Should be Resolved in the Central District of California.**

As an initial matter, any dispute concerning the Kaplan Subpoena should be resolved in the Central District of California. A motion for a protective order

---

[6] Although the brief mentioned that Dogra was precluded from recovering additional coaching employment revenue, Dogra was not actually seeking to recover any **employment** coaching revenue from CAA in the Arbitration at that time in October 2020. (Kaplan Decl., Ex. 5 [October 2020 Brief]). Rather, in October 2020, Dogra was only seeking to recover coaching **marketing and consulting revenue**, something the Arbitrator had not previously ruled on. (*Id*.). References to the coaching **employment** revenues were included to provide context and help the arbitrator differentiate between what was and was not recoverable based on his prior awards.

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY JESSE KAPLAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

concerning a deposition may be sought "in the court for the district where the deposition will be taken." Fed.R.Civ.P. 26(c)(i).   Likewise, a motion quash a subpoena must be made in the "the court for the district where compliance is required."  Fed.R.Civ.P. 45(d)(3)(A).

Here, Kaplan is a resident of Los Angeles County, California.  (Kaplan Decl., ¶ 2).  The Kaplan Subpoena seeks Kaplan's deposition in Long Beach, California which is located in the Central District of California.   (Kaplan Decl., Ex. 6). Accordingly, this Motion should be decided in the Central District of California.

**B.**    **The *Pamida* Test Is Inapplicable Because Kaplan Does Not Have Unique Information About the Arbitration that is Central to the Malpractice Lawsuit.**

The Hardin Defendants claim that the test for permitting depositions of opposing counsel articulated by *Shelton v. Am. Motors Corp.*, 805 F.2d 1323 (8th Cir. 1986), does not apply because the underlying Arbitration has concluded and is no longer pending.  In doing so, the Hardin Defendants rely on *Pamida, Inc. v. E.S. Originals*, 281 F.3d 726, 730 (8th Cir. 2002), an Eight Circuit case that addressing the the application of the *Shelton* test.  *Pamida*, however, is inapplicable because Kaplan does not have any **uniquely known** information about the underlying Arbitration that is relevant, let alone central, to the pending Malpractice Lawsuit.

*Pamida* has significant limitations.  *See Smith-Bunge v. Wisconsin Cent., Ltd.*, 946 F.3d 420, 423 (8th Cir. 2019).  Under *Pamida*, a party may only depose opposing counsel without satisfying the *Shelton* test "if a party 'seeks relevant information **uniquely known** by [the] attorneys about prior terminated litigation, the substance of which is **central to the pending case**.'" *Smith-Bunge*, 946 F.3d at 423 (quoting *Pamida*, 281 F.3d at 731 (Emphasis added); *see also Golden v. Stein*, 2020 WL 1487306, *8 (S.D. Iowa Mar. 4, 2020) ("*Pamida* does not apply unless the information sought is peculiarly within counsel's knowledge ..."); *Zhu v. Li*, No. 19CV02534JSWTSH, 2021 WL 3910720, at *2 (N.D. Cal. Sept. 1, 2021).  Opposing

13

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY JESSE KAPLAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

counsel will not have unique knowledge when others have the same information or when opposing counsel's knowledge is derivative of what was told to him by his client. *See Zhu* at \*2. It follows, the deposition of opposing counsel is not permissible for purpose of a fishing expedition. *See Golden*, 2020 WL 1487306 at \*9. If opposing counsel does not have unique information that is central to the pending case, the *Shelton* test should be applied. *See Smith-Bunge*, 946 F.3d at 423.

Here, Kaplan does not have any unique information that is central, or even relevant, to the Malpractice Lawsuit. As discussed, the Hardin Defendants vaguely contend that Kaplan has some unique knowledge about coaching employment revenue that was stated in passing in an October 2020 brief. Contrary to Defendants' attempt to distort Evans' testimony on that subject, Evans simply never testified that he lacked information about the coaching employment revenue figures at issue, or that Kaplan would have any other information about those figures. (Kaplan Decl., Ex. 4 [Evans Deposition Transcript, pp, 260-285]). Indeed, Evans' testimony was clear that he personally provided Kaplan with those figures for the brief, and that Kaplan gave Evans a high level of deference on those figures. (*Id*.). There were no questions about those figures that Evans could not answer. (*Id*.). The only subject matter that Evans was not entirely sure of was who actually drafted the October 2020 brief. (*Id*.). Who actually penned the brief, however, is irrelevant. Certainly, it is not central to the Malpractice Lawsuit.

### C.     The Deposition of Kaplan - Opposing Counsel - is Improper Under *Shelton* or *Friedman*.

The Hardin Defendants cannot justify the highly disfavored practice of deposing opposing counsel. Depositions of an opposing party's attorney of record are generally disfavored and should be permitted "only in limited circumstances." *See LA Printex Indus., Inc. v. VF Corp.*, 2014 WL 12587037, at \*3 (C.D. Cal. Jan. 14, 2014) (quoting *American Cas. Co. of Reading, Pa. v. Krieger*, 160 F.R.D. 582, 588 (S.D. Cal. 1995)). A party's counsel is "presumptively entitled to a protective" order

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY JESSE KAPLAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

prohibiting his or her deposition unless the proponent of the deposition can rebut that presumption. *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, No. SACV07250DOCANX, 2008 WL 11411715, at *6 (C.D. Cal. Feb. 28, 2008). Where a party seeks the deposition of opposing counsel, "[t]he near presumption in favor of a protective order may be overcome [only] where the attorney is a percipient witness to nonprivileged information" and other circumstances are present that warrant the deposition. *Johnson v. Couturier*, 261 F.R.D. 188, 193 (E.D. Cal. 2009). Courts generally hold that the party seeking to depose another party's attorney bears the burden of "establishing the propriety and need for the deposition." *Krieger*, 160 F.R.D. at 588; *Bybee Farms LLC v. Snake River Sugar Co.*, 2008 WL 820186, at *1 n.1 (E.D. Wash. Mar. 26, 2008).

The Ninth Circuit has not adopted a standard governing when the deposition of opposing counsel may go forward. *See Yaroshinsky v. City of Los Angeles*, 2020 WL 6048177, at *2 (C.D. Cal. Sept. 15, 2020); *Littlefield v. Nutribullet, LLC*, 2017 WL 10438897, at *4 (C.D. Cal. Nov. 7, 2017). Many district courts in this Circuit, however, have adopted the Eighth Circuit test from *Shelton*, 805 F.2d 1323. *See, e.g., Sound View Innovations, LLC v. Hulu, LLC*, 2019 WL 9047211, at *7 (C.D. Cal. Nov. 18, 2019); *S.L. v. Upland Unified Sch. Dist.*, 2019 WL 8163805, at *2 (C.D. Cal. Oct. 4, 2019); *Chao v. Aurora Loan Servs.*, LLC, 2012 WL 5988617, at *3 (N.D. Cal. Nov. 26, 2012); *DiLorenzo v. Costco Wholesale Corp.*, 243 F.R.D. 413, 415 (W.D. Wash. 2007); *Gilbert v. Money Mutual, LLC*, 2016 WL 3196605, at *6 (N.D. Cal. June 9, 2016). Under *Shelton*, a party seeking to depose the opposing party's counsel must show that:

> (1) no other means exist to obtain the information than to depose opposing counsel;
>
> (2) the information sought is relevant and nonprivileged; and
>
> (3) the information is crucial to the preparation of the case.

*See Shelton*, 805 F.2d at 1327.

15

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY JESSE KAPLAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

The Second Circuit has articulated a similar, yet slightly different, standard governing attorney depositions. *See In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 71-72 (2d Cir. 2003). The *Friedman* test "takes into consideration all of the relevant facts and circumstances," such as "the need to depose the lawyer, the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation, the risk of encountering privilege and work-product issues, and the extent of discovery already conducted." *Id.* at 72. Some courts in this Circuit have favored the Second Circuit's approach in *Friedman* over the *Shelton* test in the context of subpoenaing opposing counsel for a deposition. *See Boeing Co. v. KB Yuzhnoye*, 2015 WL 12803452, at *9 (C.D. Cal. Nov. 3, 2015); *Younger Mfg. Co. v. Kaenon, Inc.*, 247 F.R.D. 586, 588 (C.D. Cal. 2007). Arguably, there is little to no materially difference between the two tests, both of which considers the necessity of deposing opposing counsel. "Practically speaking, the two approaches are only 'slightly different' " *Monster Energy Co. v. Vital Pharm., Inc.*, 2020 WL 2405295, at *8 (C.D. Cal. Mar. 10, 2020) (quoting Littlefield, 2017 WL 10438897, at *4).

### 1.    <u>The information sought from Kaplan is not crucial and is at most, tangentially relevant</u>.[7]

The information sought from Kaplan is not crucial to the defense of the Malpractice lawsuit, and at most, has tangential relevance. As discussed, Kaplan and F+T had extremely limited involvement in the Arbitration until 2020, approximately four year after the Hardin Defendants committed malpractice in 2016. Kaplan's involvement in the Arbitration during the critical time period in 2016 was literally non-existent. **Again, Kaplan rendered no services to Dogra until April 2020**. (

---

[7] Because Dogra has filed a malpractice claim, Kaplan does not dispute that the Hardin Defendants are entitled to at least some otherwise privileged information from the Arbitration proceeding. While Kaplan does not concede that there has been a blanket "waiver" of the privilege, for at least the purpose of this Motion, Kaplan does not contend that there are privilege concerns unless the Hardin Defendants seek privileged communications about the Malpractice Lawsuit, including privileged information in preparation for the Malpractice Lawsuit.

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY JESSE KAPLAN'S MOTION FOR
A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

Kaplan Decl., ¶ 7).

At most, the Hardin Defendants have identified a discrete issue concerning the inclusion of a coaching employment revenue figure in a brief that F+T submitted to the arbitrator in the Arbitration in 2020.  As discussed, the coaching employment figure (approximately $1.4 to $2.1 million) that was included in the October 2020 brief was provided by Evans.  Moreover, it is not clear why Kaplan would have any additional information about that figure.

### 2. There are other means to obtain the requested information.

Even if Kaplan was in possession of information that was both relevant and "crucial" to the Malpractice Lawsuit (which he does not), the Hardin Defendants can get any information related to the Arbitration from a variety of other witnesses. Again, the Hardin Defendants have deposed Dogra and the key participants on Dogra's internal legal team during the Arbitration.  These other witnesses have detailed information about what occurred during the Arbitration, including key periods of time in 2016 and during the audit that was completed in 2019.

To the extent the Hardin Defendants had questions about the $1.4 to $2.1 million in coaching employment revenue, they were able to depose Evans on that subject.

### C. Kaplan is Entitled to a Protective Order under Rule 26 Even if _Shelton_ and _Friedman_ do Not Apply.

Even if the _Shelton_ or _Friedman_ standards did not apply, Kaplan is still entitled to a protective order under Rule 26 and/or to quash under Rule 45.  Rule 45 governs non-party subpoenas. Under Rule 45(d)(3)(iv), the Court must quash or modify the subpoena if the subpoena subjects a person to undue burden.  _See_  Fed.R.Civ.P. 45(d)(3)(iv).  The Court may also issue a protective order limiting discovery under Rule 26(c).  _See_ Fed. R. Civ. P. 26(c).  The Court may issue a protective order to protect Kaplan from "annoyance, embarrassment, oppression, or undue burden or expense." Fed.R.Civ.P. 26(c)(1).  A court "must limit the frequency or extent of

17

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY JESSE KAPLAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

discovery otherwise allowed by [the Federal] rules" if "the discovery sought is unreasonably **cumulative or duplicative, or can be obtained from some other source** that is more convenient, less burdensome, or less expensive." Fed.R.Civ.P. 26(b)(2)(C)(Emphasis added).

To the extent that the Hardin Defendants seeks information about what transpired during the Arbitration, they can first attempt to obtain that information from other sources more convenient and less burdensome than through the disfavored practice of deposing opposing counsel. As already discussed, there are a number of witnesses from Dogra's internal team that the Hardin Defendants have deposed. These other witnesses have information of what transpired during the Arbitration, in particular facts that are central to the Malpractice Lawsuit.

## DEFENDANTS' POSITION:

### I.     BACKGROUND

#### A. The Arbitration

Plaintiff, represented by RHA, convinced the Arbitrator that CAA had no cause to terminate Dogra and that he did not owe the company approximately $9,000,000, as CAA claimed, but rather CAA owed Dogra substantially more—approximately $20,000,000 at the conclusion of the Arbitration—which included $2,756,503 in coaching revenue based on an analysis by CAA's damages expert which ***Dogra's expert*** said was fair. Dogra never offered the Arbitrator a higher number. Now Dogra says he is entitled to some amount of additional coaching revenue, although he does not know how much. (Emery Decl. Ex. E, pp. 11–12.)

#### B. The Lawsuit

Almost five years after the alleged malpractice, Plaintiff—through Mr. Kaplan's firm, F+T—filed a lawsuit against RHA alleging claims for malpractice and breach of contract. (Emery Decl. ¶ 2; *see also* Kaplan Decl. Ex. 1.) Since filing this lawsuit, Plaintiff has not been able to substantiate his claim for additional coaching revenue damages.

RHA has sought discovery concerning the nature and amount of Plaintiff's alleged damages. Throughout the course of discovery, RHA has questioned numerous witnesses concerning this moving target. Plaintiff was asked about his own claim for damages beyond what he had already been awarded and accepted. He had only this to say:

> Q:    All right. ***How much more do you want***?
>
> A:    ***I don't know the exact amount***. It's – it would be subject to the damages for coaches that we're trying to get the evidence from CAA. And the gentleman that works with me, Kyle Evans, has been handling most of that.
>
> Q:    ***Do you know an approximate amount*** that you are seeking from Mr. Hardin?
>
> A:    ***I don't know the approximate amount***.

(Emery Decl. Ex. E, pp. 11–12.)

Yet Plaintiff did know some form of an approximate amount years earlier, communicating it to the Arbitrator in the Arbitration at Mr. Kaplan's direction as early as 2020. In the October 2020 submission to the Arbitrator (drafted by Mr. Kaplan and signed by Mr. Freedman), Plaintiff claimed that he forfeited "millions of dollars in coaching revenue that he would otherwise have been entitled to," attributing it to the language used in the PHB in 2016 that secured his award, all for the purpose of securing other categories of damages in the latter stages of the Arbitration. (Kaplan Decl. Ex. 5, p. 11.) RHA asked Kyle Evans, one of the other legally-trained sports agents who was representing Plaintiff during the Arbitration, for the factual basis of this and other statements in that submission. In numerous instances, Mr. Evans deferred to Mr. Kaplan—as Mr. Kaplan was the "primary drafter." (Kaplan Decl. Ex. 4, pp. 283).

Coaching client revenues—the same category of revenues central to the above representations drafted by Mr. Kaplan and made to the Arbitrator in the Arbitration—

19

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY JESSE KAPLAN'S MOTION FOR
A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

are the *only* category of damages sought by Plaintiff in this lawsuit as a result of RHA's alleged malpractice. Mr. Kaplan must be questioned to find out what he knew and when as a factual matter in the Arbitration about Plaintiff's alleged harm in this lawsuit. Though this is not the only reason Mr. Kaplan (and Mr. Freedman) should be questioned as fact witnesses in this lawsuit, it is reason enough to deny Mr. Kaplan's motion.

### C. The Parties' Discovery Disputes

Since the early stages of discovery, Plaintiff has restricted RHA's access to responsive documents and communications between Plaintiff and the other lawyers representing him during the course of the Arbitration. On February 25, 2022, RHA filed a Motion to Compel Production of Improperly Withheld Documents based on Plaintiff's withholding of documents on the basis of attorney–client privilege. (Emery Decl. ¶ 4; *see also* Emery Decl. Ex. B.) Plaintiff sought to invoke the attorney–client privilege over years of legal advice given during the Arbitration and refused to produce (or allow other attorneys to produce) any documents or communications after October 31, 2018—the date on which Plaintiff alleges RHA no longer represented him. (*Id.*) Because Plaintiff placed such communications at issue, the Honorable Judge Hamilton of the United States District Court for the Eastern District of Missouri entered an order granting RHA's motion to compel and overruling Plaintiff's attorney–client privilege objections. (Emery Decl. ¶ 5; *see also* Emery Decl. Ex. C.)

Despite Judge Hamilton's order, Plaintiff maintained "limited privilege [and] work-product" objections to thirty-four of RHA's Requests for Production while simultaneously refusing to provide a detailed privilege log for documents withheld on the basis of privilege during the time period in which the Arbitration was pending. (Emery Decl. Ex. D.) Instead, Plaintiff provided a single-row "categorical privilege log" covering broad categories of withheld documents spanning a time period of at least fifteen months during which the Arbitration was pending. (*Id.*) On September 20, 2022, RHA filed a Motion to Compel Production of Plaintiff's Privilege Log.

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY JESSE KAPLAN'S MOTION FOR
A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

(Emery Decl. ¶ 6; *see also* Emery Decl. Ex. D.) The motion is fully briefed and pending resolution in the Eastern District of Missouri.

On October 17, 2022, RHA issued a Subpoena to Testify at a Deposition in a Civil Action to Mr. Kaplan. (Emery Decl. ¶ 10; *see also* Emery Decl. Ex. G.) On October 21, 2022, counsel for Plaintiff and RHA met and conferred regarding RHA's subpoena to Kaplan. (Emery Decl. ¶ 10.) During the call, counsel for RHA reiterated that RHA has no intention of invading the attorney–client privilege for client communications in the current malpractice lawsuit but rather seeks to question Mr. Kaplan concerning his demonstrable involvement throughout the course of the Arbitration. (*Id.*) This includes the statements made by him on Plaintiff's behalf during the Arbitration concerning the amount of alleged coaching contract revenues realized during the audit—which alleged amount Plaintiff claims as damages in the current malpractice lawsuit. (*Id.*) As of October 31, 2022, RHA had made ten service attempts on Mr. Kaplan at his office and home addresses. (*Id.*)

## II.    ARGUMENT AND AUTHORITIES

### A. This Court Should Transfer the Motion to the Eastern District of Missouri (the Issuing Court) to Avoid Inconsistent Outcomes on Overlapping Discovery Issues.

The motion should be transferred to the Issuing Court because "exceptional circumstances" exist. Federal Rule of Civil Procedure 45(f) provides that "[w]hen the court where compliance is required did not issue the subpoena, it may transfer a motion under this rule to the issuing court if the person subject to the subpoena consents or if the court finds exceptional circumstances." Fed. R. Civ. P. 45(f). The Advisory Committee Notes to Rule 45 describe when exceptional circumstances may be found:

> In the absence of consent, the court may transfer in exceptional circumstances, and the proponent of transfer bears the burden of showing

21

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY JESSE KAPLAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

that such circumstances are present. ***The prime concern should be avoiding burdens on local nonparties subject to subpoenas***, and it should not be assumed that the issuing court is in a superior position to resolve subpoena-related motions. In some circumstances, however, ***transfer may be warranted in order to avoid disrupting the issuing court's management of the underlying litigation, as when that court has already ruled on issues presented by the motion*** or the same issues are likely to arise in discovery in many districts. Transfer is appropriate only if such interests outweigh the interests of the nonparty served with the subpoena in obtaining local resolution of the motion.

Fed. R. Civ. P. 45 Advisory Committee's Note to 2013 Amendment (emphasis added). The "question before the Court on the motion to transfer involves a balancing test—whether the circumstances favoring transfer outweigh the interests of the nonparty served with the subpoena in obtaining local resolution of the motion." *E4 Strategic Sols., Inc. v. Pebble Ltd. P'ship*, SA MC 15-00022-DOC, 2015 WL 12746706, at *3 (C.D. Cal. Oct. 23, 2015) (citation omitted).

### 1. The Issuing Court Has Already Considered Overlapping Discovery Issues.

When the issuing court has already considered issues implicated in a subpoena-related motion, transfer is warranted. *Drennen v. Certain Underwriters at Lloyd's of London*, No. 2:20-mc-0330-DMG, 2021 WL 4978459, at *1 (C.D. Cal. Feb. 16, 2021) (finding transfer appropriate where the issuing court had already considered issues critical to the motion to quash and was thus familiar with the issues relevant to the disputed deposition and better positioned to determine whether the deposition should be permitted to proceed); *see also Moon Mountain Farms, LLC v. Rural Cmty. Ins. Co.*, 301 F.R.D. 426, 429 (N.D. Cal. 2014) (finding transfer appropriate where "issues raised in the motion to compel relate to orders and discovery from the underlying . . . case."); *E4 Strategic Sols., Inc.*, 2015 WL 12746706, at *4 (finding transfer appropriate where issuing court is in a better position to rule on the petition to quash due to "familiarity with the full scope of issues involved as well as any implications the resolution of the motion will have on the underlying litigation.").

22

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY JESSE KAPLAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

Here, the Issuing Court has previously ruled on discovery issues concerning overlapping issues to those presented by Plaintiff in the motion—the discoverability of documents, communications, and information relating to the involvement of Plaintiff's numerous attorneys in the Arbitration. Further, RHA's Motion to Compel Production of Plaintiff's Privilege Log is fully briefed and pending before the Issuing Court. The substantive issues raised in this motion are "intertwined with the intricacies of the underlying case," and the Issuing Court has been actively involved in determining the scope of relevant and permissible discovery. *See Le v. Zuffa, LLC*, No. 2:17-mc-00016-PSG, 2017 WL 11632246, at *4 (C.D. Cal. Mar. 17, 2017). Thus, the interest of judicial economy weighs in favor of transfer.

### 2. *There is Little to No Burden Imposed on Mr. Kaplan by Transferring the Motion to the Issuing Court.*

Kaplan would face little to no burden by transferring the motion to the Issuing Court. When considering the burden on a subpoenaed party, courts consider various factors. For example, in *E4 Strategic Solutions, Inc.*, the Court addressed the subpoenaed party's argument that substantial interest in local resolution existed where: (1) the subpoenaed party was an individual, as opposed to a large corporation; (2) there was a significant difference in cost with respect to traveling to the Issuing Court; and (3) a transfer would impose a financial burden that would prevent counsel from litigating the motion in a way that counsel for the non-party believed to be in the best interest of their client. *E4 Strategic Sols., Inc.*, 2015 WL 12746706, at *5. The Court ultimately found that the subpoenaed party did not offer evidence of burden rising to the level needed to outweigh the exceptional circumstances warranting transfer. *Id.*

Though Mr. Kaplan is an individual, the concerns associated with subjecting a non-party subpoenaed individual to transfer of a motion away from the district of compliance do not exist here. Rather, Mr. Kaplan is attorney of record for Plaintiff,

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY JESSE KAPLAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

and he has been admitted pro hac vice to practice in the lawsuit pending in the United States District Court for the Eastern District of Missouri. (Kaplan Decl. ¶ 3.)

"[T]he cost of litigation alone does not constitute an unfair burden." *Agincourt Gaming, LLC v. Zynga, Inc.*, No. 2:14-cv-0708-RFB, 2014 WL 4079555, at \*7 (D. Nev. Aug. 15, 2014). The Court in *E4 Strategic Solutions, Inc.* considered in its burden analysis that there was no indication that a hearing would be held by the Issuing Court on the motion, and if so, there was no indication that personal attendance would be required. *See E4 Strategic Sols., Inc.*, 2015 WL 12746706, at \*5. Mr. Kaplan cannot show that litigating the motion in the Issuing Court would even require travel. Indeed, the Issuing Court resolved RHA's Motion to Compel Production of Improperly Withheld Documents without a hearing. Further, Mr. Kaplan is already admitted pro hac vice in the lawsuit pending in the Issuing Court. *See id.* (considering as part of the burden analysis that subpoenaed party's counsel had already been admitted pro hac vice in the underlying action pending in the issuing court).

### B. In the Alternative, the Court Should Deny the Motion Because RHA Seeks Information Related to a Previously Concluded Case.

The Federal Rules of Civil Procedure provide that "[a] party may . . . depose any person." Fed. R. Civ. P. 30(a)(1). There is no express prohibition against the taking of attorney depositions, including depositions of attorneys representing the opposing parties in the case. *Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1327 (8th Cir. 1986). The Ninth Circuit has not adopted a standard governing when the deposition of opposing counsel may go forward. However, many district courts in the Ninth Circuit have adopted the *Shelton* test set forth by the Eighth Circuit. *Littlefield v. Nutribullet, LLC*, No. CV 16-6894 MWF, 2017 WL 10438897, at \*4 (C.D. Cal. Nov. 7, 2017); *see also Shelton*, 805 F.2d at 1327.

Since *Shelton*, the Eighth Circuit clarified in a subsequent decision that the heightened protection afforded by the *Shelton* test is inapplicable "to attorneys who

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY JESSE KAPLAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

represented a client in a completed case and then also happened to represent that same client in a pending case where the information known only by the attorneys regarding the prior concluded case was crucial." *Pamida, Inc. v. E.S. Originals*, 281 F.3d 726, 730 (8th Cir. 2002); *see also Dowie v. Fleishman-Hillard Inc.*, No. CV 05-3122-MMM, 2006 WL 8434394, at *2 (C.D. Cal. Jan. 27, 2006) ("Plaintiff should not be foreclosed from undertaking discovery to support his . . . claim, merely because [the defendant] elected to use the same attorney to handle both the criminal investigation and this civil litigation.").

### 1. The Shelton Test Does Not Apply Because the Information Sought Relates to Terminated Litigation.

The *Pamida* court determined that "[t]he concerns raised in *Shelton* regarding abuse of the discovery process . . . are not implicated in this case where [the defendants] seek relevant information uniquely known by [the plaintiff's] attorneys about prior terminated litigation, the substance of which is central to the pending case." *Pamida, Inc.*, 281 F.3d at 731. Rather, such proposed depositions should be evaluated under the ordinary discovery standards of the Federal Rules of Civil Procedure and any asserted privileges. *Id.*; *see also aaiPharma, Inc. v. Kremers Urban Development Co.*, 361 F. Supp. 2d 770, 775 (N.D. Ill. Mar. 21, 2005) (finding that *Shelton* did not apply when the deposition of the plaintiff's attorneys would probe the attorneys' conduct during terminated litigation and instead considering the plaintiff's relevance, burden, and privilege objections).

The Issuing Court has already overruled Plaintiff's attorney–client privilege assertions for documents and communications relating to the various attorneys involved in the Arbitration. Further, there is no question that Mr. Kaplan—one of Plaintiff's attorneys during the Arbitration that now serves as the basis for Plaintiff's malpractice allegations against RHA—is the source of relevant and uniquely known information concerning the events of the Arbitration. Mr. Kaplan, as the "primary

DISCOVERY MATTER: JOINT STIPULATION REGARDING NON-PARTY JESSE KAPLAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

drafter" of Arbitration briefing containing various representations to the Arbitrator regarding the value of coaching client revenues owed to Plaintiff—significantly, the *same category of damages Plaintiff seeks in this lawsuit*—has both unique and exclusive knowledge concerning those representations. (Emery Decl. ¶ 3; *see also* Kaplan Decl. Exs. 4, 5.) RHA is entitled to question Mr. Kaplan—a fact witness— regarding his involvement in the Arbitration, as RHA has done for every other fact witness extensively involved in the Arbitration. *See ATS Prods., Inc. v. Champion Fiberglass, Inc.*, No. 13-cv-02403-SI, 2015 WL 3561611, at *6 (N.D. Cal. June 8, 2015) ("To permit a fact witness to evade a deposition simply because he acted as an attorney in a prior case would invite parties to retain the same counsel in subsequent cases to avoid revealing information that would otherwise be discoverable."). Therefore, under *Pamida* and the general standards of the Federal Rules of Civil Procedure, Mr. Kaplan's motion should be denied.

> 2. *Even Under the Shelton and Friedman Standards—Which RHA Does Not Concede Apply to the Present Analysis—Mr. Kaplan's Deposition is Appropriate.*

Even under the more stringent *Shelton* standard, RHA is entitled to take Mr. Kaplan's deposition. Pursuant to *Shelton*, the court must consider the relevance of the attorney-deponent's testimony and the privilege concerns it raises, whether other means to obtain the information are available, and whether the attorney's testimony is crucial to the case. *Shelton*, 805 F.2d at 1327; *see also Littlefield*, 2017 WL 10438897, at *5. The less stringent *Friedman* standard set forth by the Second Circuit "takes into consideration all of the relevant facts and circumstances," such as "the need to depose the lawyer, the lawyer's role in connection with the matter on which discovery is sought and in relation to the pending litigation, the risk of encountering privilege and work-product issues, and the extent of discovery already conducted." *In re Subpoena Issued to Dennis Friedman*, 350 F.3d 65, 72 (2d Cir. 2003).

As discussed above, Mr. Kaplan possesses relevant information as one of the

DISCOVERY MATTER: JOINT STIPULATION REGARDING NON-PARTY JESSE KAPLAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA

numerous attorneys consulted by Plaintiff during the Arbitration. (*See* Emery Decl. Ex. F.)

Further, Mr. Kaplan is in possession of unique knowledge and information that is not available through other means. Since the early stages of discovery, Plaintiff has resisted RHA's efforts to obtain information concerning the involvement and conduct of Plaintiff's various attorneys. And despite the Issuing Court already overruling Plaintiff's early objections on this point once, the parties continue to dispute Plaintiff's remaining privilege assertions relating to communications between Plaintiff and Mr. Kaplan's law firm occurring prior to the filing of this lawsuit and while the Arbitration was still pending. Plaintiff's resistance throughout discovery in this lawsuit has inhibited RHA from obtaining relevant and crucial information concerning the Arbitration, the conduct of the attorneys involved, and the alleged damages that Plaintiff claims he suffered.

Mr. Kaplan is in a superior position and the best (and only) source for information concerning his unique involvement and counsel provided to Plaintiff during the course of the Arbitration, including to the decisions behind representations made to the Arbitrator concerning the amount of coaching contract revenues in excess of $2,756,503 that Plaintiff was allegedly owed under his contract with CAA.

Finally, Mr. Kaplan's testimony is crucial to this case. Despite the involvement of numerous attorneys—including Mr. Kaplan—in the Arbitration, Plaintiff has only asserted malpractice claims against RHA. As a fact witness and one of the attorneys involved in the Arbitration that now serves as the factual foundation for Plaintiff's malpractice claims against RHA, Mr. Kaplan cannot evade a deposition simply because he also represents Plaintiff in this lawsuit. Such unusual circumstances of Plaintiff's own making do not preclude RHA's ability to obtain crucial testimony from a knowledgeable fact witness.

## III.   **DEFENDANTS' CONCLUSION**

Mr. Kaplan cannot show undue burden outweighing the importance of

27

preventing inconsistent rulings, the risk of disrupting management of the lawsuit pending before the Issuing Court, and the preservation of judicial economy. Therefore, exceptional circumstances exist warranting transfer of the motion to the United States District Court for the Eastern District of Missouri.

In the alternative, Mr. Kaplan's motion should be denied under *Pamida* and the general standards of the Federal Rules of Civil Procedure.

Dated: November 3, 2022    FREEDMAN + TAITELMAN, LLP


By: _____
Bryan J. Freedman, Esq.
Jesse A. Kaplan, Esq.
FREEDMAN + TAITELMAN, LLP
Attorneys for Non-Party Jesse Kaplan


Dated: November 3. 2022    FORD, WALKER, HAGGERTY & BEHAR

By: _____
Katherine M. Harwood, Esq.
Attorneys for Defendants,
RUSTY HARDIN and
RUSTY HARDIN AND ASSOCIATES, LLP

DISCOVERY MATTER:  JOINT STIPULATION REGARDING NON-PARTY JESSE KAPLAN'S MOTION FOR A PROTECTIVE ORDER AND TO QUASH THE SUBPOENA